IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| JOEL IACOPELLI, | ) | Civil Action No.: 9:16-cv-287-PMD-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| THE TOWN OF PORT ROYAL, SOUTH | ) | |
| CAROLINA, ROBERT BILYARD, | ) | |
| Individually and in his Official Capacity, | ) | |
| JOHN GRIFFITH, Individually and in his | ) | |
| Official Capacity, HOPE HAVEN OF | ) | |
| THE LOWCOUNTRY, INC., a South | ) | |
| Carolina, non-profit Corporation., | ) | |
| BEAUFORT COUNTY DEPT OF | ) | |
| SOCIAL SERVICES, an agency of the | ) | |
| State of South Carolina, LATASHA | ) | |
| WILLIAMS, Individually and in her | ) | |
| Official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**PLAINTIFFS' RESPONSE IN  OPPOSITION
TO DEFENDANT DSS AND LATASHA WILLIAMS'
MOTION FOR SUMMARY JUDGMENT**

---

The Plaintiff, Joel Iacopelli, responds to this Defendant's Motions for Summary Judgment and

assertion of Qualified Immunity as follows:

> *"Well, kind of the way you're saying it, it's like I just didn't do anything . . .."* - Latasha Williams, June 28th 2016.

**I.    FACTS:**

1

In a finger-pointing contest, Defendant Robert Bilyard testified that the assistant solicitor, Mary Concannon Jones, told him to contact the Beaufort County Department of Social Services (DSS) and notify DSS of the investigation of a sexual assault case involving Joel Iacopelli that allegedly occurred at Community Bible Church (CBC) approximately a week prior to the brief Jones/Bilyard phone conversation. The minor child alleged to have been assaulted was not a member of the Iacopelli household and the alleged assault did not occur at or near the Iacopelli home. Solicitor Jones adamantly denies that she told Bilyard anything of the sort, especially since the allegation of abuse did not involve any of the Iacopelli children. *See*, (Jones Depo. at pp. 77:16 - 78:5).

At any rate, on July 10th 2015 Defendant Bilyard contacted DSS and notified the agency that Joel Iacopelli was accused of child sexual assault that allegedly occurred at CBC on June 28th 2015. The Plaintiff's husband was arrested on July 10th 2015 at his residence and the Iacopelli home was searched. The search of the Iacopelli home yielded no evidence of any criminal activity whatsoever. The Plaintiff, Marianne Iacopelli, witnessed the arrest and kept the Iacopelli's four children in the backyard pool area during the arrest and hour-long search. On July 11th 2015, the Port Royal Town contract judge refused to hold a bond hearing and summarily denied bond.

Over that weekend, Marianne was an emotional wreck and reached out to her friends for support. A neighbor, Stephanie Agatep, came to Marianne's aid and a friend from New York, Serena Falzone, flew down to Beaufort on July 12th 2015 to lend emotional support. Both her friend from New York and her neighbor stayed with Marianne and the four Iacopelli children over next the week. Both Mrs. Agatep and Mrs. Falzone were present on Monday, July 13th 2015 when DSS came unannounced to the Iacopelli home. Marianne was frantic when DSS came. The DSS interview

2

occurred on the front porch and Marianne had to keep going inside to clam down with the support of her friends. *See*, (Agatep Depo. at p. 25:3-25 - 26:1-15).

Defendant Williams made an assessment that Mrs. Iacopelli took very good care of her children, was a "protector" of her children and that the Iacopelli residence was immaculate. Defendant Williams after consulting with Theresa Greene, a foster care worker who accompanied Williams, learned that all four children were neat, clean, healthy, had no visible injuries, knew how to call 911, all felt safe, denied any abuse, and knew about "good touch-bad touch" scenarios. There was no evidence anyone at the Iacopelli household was in distress or possible impending distress. Defendant Williams knew that Mr. Iacopelli was incarcerated at the Beaufort County Detention Center with bond denied. Williams also knew that there was no allegation or complaint made about Mr. Iacopelli *vis-a-vis* his children.

There was no objective criteria, any objective basis or any evidence that there existed any Threat of Harm (TOH) to the Iacopelli children. Marianne Iacopelli presented favorably to Williams, denied that any of the children had been abused and told Williams that her husband was innocent and had been falsely accused of the alleged CBC incident. Marianne further told Williams that she [Williams] could check out that situation because the church had video cameras. DSS, however, through the actions of the Defendant Williams *forced* Marianne Iacopelli to sign a "Safety Plan," under the clear threat that her children would be immediately taken into custody and DSS would place her four children into foster care. Marianne testified as to the exchange with Defendant Williams as follows:

IACOPELLI, MARIANNE, (Page 36:8 to 36:18)

3

8   I told her at that point I didn't want
9   to sign that plan because I didn't think that
10   that was fair, and **she said you have to sign it.**
11        And then I said, well can you ask your
12   supervisor because at that point I assumed that
13   Miss Speller was the supervisor; and she says my
14   supervisor is not here.  And I said well, then
15   who is the one by the car.  **She said she was**
**16   from *foster care*, and I said I didn't want to**
**17   sign the paper and she said you have to sign the**
**18   paper *or else* we will take the children with us.**
     (Emphasis added).

As further evidence of undue coercion, the pre-printed "Safety Plan," (DSS Form 3087) plainly

provides that:

> "**If the parent(s) refuse to sign a valid safety plan, an out of home placement must be sought by Law Enforcement or Ex Parte Order to keep the child safe, pending the completion of the investigation."**  (Emphasis in Original).

The Safety Plan additionally informed the Iacopelli's that, "**[s]hould these services prove ineffective**

**and it is no longer possible for this child to remain safely within the family home, out-of-home**

**care is the planned arrangement for this child**." "[x] **Yes**" (Emphasis in Original).  *See*, (DSS

Safety Plan).   The Safety Plan provided for "supervised visitation," not supervised contact.

"Visitation," is a term of art.  It was explained to Marianne that her husband could not reside in the

home until the completion of the investigation.  *See*, (Marianne Iacopelli Depo):

IACOPELLI, MARIANNE, (Pages 36:19 to 37:12)

19   And then I asked her to explain what
20   unsupervised meant, and she said that meant that
21   if at any point your husband was at the house
22   with you and the children were home, a Beaufort
23   County Deputy can come or Mr. Bilyard can come
24   or she can come in for a pop visit, and if they
25   find him there they would arrest both me and him

37
1    and take the children to foster care.

2    **Q   If he were there and you weren't there?**
3    A    No, even if I was there.

4    **Q   Okay.**

5    A    Because I could, as she said I can go
6    into the bathroom or I could leave the room and
7    that would be considered unsupervised.

8    **Q   Okay.**
9        **And she said that if you didn't sign**
10   **it, the children would -- they would take the**
11   **children with them right then?**
12   A    Yes.

As a result of the terror inflicted upon Marianne by the Defendant and DSS**,** Marianne testified that she had no choice but to sign the Safety Plan.   The Safety Plan's literal terms had no expiration date, but the time period for the investigation could last up to October 13th 2015.

DSS  policy requires that certain rights must be explained to persons subjected to a Safety Plan and DSS forms are given to persons subjected to State control in this situation.  *See*, (DSS Brochure 3034).   The Defendants did not contact or interview Joel Iacopelli nor inform his of his rights as a suspected perpetrator.    DSS instructed Defendant Williams to make contact with Joel, however, she failed to do so and failed to conduct any investigation other than obtain a NCIC criminal history which showed the Joel had no criminal  record,  no record of any prior arrests, except for the single allegation, and that he had no outstanding warrants.  Other than scaring the living daylights out of Marianne on July 13th 2015 and thereafter,  DSS had no further contact with any of the Iacopelli's whatsoever.  *See*, (Williams Depo. at 33:8-15):

    "Q.    **And  in  this  case,  you  did  not  follow  up  with  any  - -**

5

> wanting to do any further interviews with any of the
> **Iacopelli children or Mrs. Iacopelli; is that correct?**
> A.    I thought that they were safe, That's correct.
>
> Q.    **Okay.  So you didn't need to do anything further?**
> A.    Not with the children and not with Mrs. Iacopelli."

DSS claims that it sent a letter notifying the Iacopelli's on August 17th 2015 that the case was

"unfounded." This alleged notice letter did not address the Safety Plan. That supposed letter was sent

to the wrong address and was never received by the Iacopelli's or their counsel until it was produced

by DSS in an answer to discovery in this case.

Further, DSS knew the Iacopelli's were represented by undersigned counsel, but never

notified undersigned counsel by any means of communication whatsoever about the unfounded status

of the case. A  DSS theme of its defense is that:  DSS was not allowed to talk to the Iacopelli's

*directly*.  DSS uses this fact to somehow make it look like the Plaintiffs' impeded their investigation.

This assertion, however, is a red herring to divert the fact that DSS effectively removed Mr. Iacopelli

from his home and failed to monitor or relieve the Iacopellis from the onerous burden of the Safety

Plan.  Defendant Williams testified:

> Q    **Okay. And you do not recall that one of the**
> **pamphlets specifically informed parents that they had a**
> **right to counsel, and even specifically informs them if**
> **they can't afford counsel, that arrangements would be made**
> **to try and get them counsel?**
> A     Yes.
>
> Q     **Okay. So Mrs. Iacopelli, by having an attorney,**
> **didn't do anything wrong in DSS's eyes, did they -- did**
> **she?**
> A Oh, no. No.
>
> A No, sir.

> Q        **All right. And you say it's common, or let's**
> **maybe say it's not uncommon, that parents do have counsel,**
> **and that if you need to contact children or schedule**
> **appointments, that you do that through counsel, and that's**
> **not unusual, is it?**
> A No.
>
> Q **Okay. And in this case, you did not follow up**
> **with any -- wanting to do any further interviews with any**
> **of the Iacopelli children or Mrs. Iacopelli; is that**
> **correct?**
> A I thought that they were safe. That's correct.
>
> Q **Okay. So you didn't need to do anything further?**
> A Not with the children and not with Mrs.
> Iacopelli.  (Williams Depo. at 34:15 -35-15).

There is no evidence that DSS attempted any follow up directly or through counsel, other than

eventually providing a copy of the Safety Plan over two weeks after Marianne signed it.  It is obvious,

or at least inferable, that DSS had no plan to monitor or modify their invasive plan other than to just

let it lapse or unfound the case.

Comparable to the old Abbot & Costello shtick, "Who's on first base-and-What's on second

base," Defendant Williams, Port Royal Police Department, Beaufort County Sheriff's Office and

Hope Haven went in circles of trying to determine who can make a referral to  Hope Haven for

forensic interviews of the Iacopelli children.  Finally, Hope Haven called Defendant Williams and

informed her that the unrelated minor involved in the alleged CBC incident had already been

interviewed.  The Defendants use these facts in an attempt to show that DSS, did something to

investigate the supposed threat of harm (TOH) to the Iacopelli children their Safety Plan sought to

address.  There was simply no reason to have the Iacopelli children forensically interviewed, because

they all were interviewed by Theresa Greene and none of the children reported any indications of any

type of abuse.  DSS chose to severely disrupt the Iacopelli household,  instead of checking on and

investigating the unrelated minor child  that was alleged to have been assaulted.  Further, the DSS

Safety Plan did not provide for forensic interviews of the Iacopelli children, ostensibly because all had

been interviewed by Ms. Greene, all appeared well, all children denied any reports of untoward

conduct, all knew "Good-Touch-Bad Touch" scenarios, and all of the Iacopelli children felt safe and

secure with their parents.

On the critically  incomplete DSS "intake form" filled out on July 13th 2015, Williams made

a threat level assessment of a "6 out of 10," based on no objective criteria.  Mrs. Iacopelli executed

a HIPAA release for the children's medical records, but DSS never sought any medical records. *See*,

(DSS Bates No. 17-18).  On the DSS intake "Fact Sheet," Williams failed to obtain any assessment

information.  Other than listing the children's names and noting all reported that they were fine, items

3-15 (assessment information) is left totally blank. *See*, (DSS Bates No. 13-16).  Williams listed all

of the Iacopelli children as "alleged victims,"  when if fact none of the children were "alleged victims"

as reported to DSS.  The only threat of harm was based on Mr. Iacopelli's arrest for an alleged

incident at CBC that did not involve any of his children nor allegedly occur at or near Iacopelli

residence.

Without any reason or justification DSS initially found that there existed a "substantial risk

of sexual abuse." (SCDSS Intake Form at Bates Num. 006).  The Intake form states. "Alleged victim

is not his child and does not reside in his household." *Id*.  Williams identified the "alleged victims,"

as the Iacopelli children and noted that: "Is in Imminent Danger: *Unknown*. Need Medical Treatment:

*Unknown*." It is unknown as to why Williams reported this on the intake form, when the day before

she and Ms. Greene conducted face-to-face interviews and found that the Iacopelli children had made

no allegations of inappropriate touching, were just fine, in no distress, and felt safe at home.

Without any further contact with the Iacopelli family or any substantive investigation, DSS made a decision to "unfound" the case against Mr. Iacopelli. This decision was made by DSS on August 11th 2015, about two weeks prior to the criminal charge being dismissed and after Mr. Iacopelli's release from custody. Even when DSS became aware that Mr. Iacopelli was released from jail, DSS still did nothing. When he was released from custody, Mr. Iacopelli moved in with his parents because of the Safety Plan and Defendant Williams instructing Mrs. Iacopelli that Mr. Iacopelli had supervised "visitation" which meant he could not be in his home, even with Mrs. Iacopelli present, or else they both could be arrested, and thrown in jail and the children would be placed in foster care.

Although the decision to "unfound" the Iacopelli case was made on August 11th 2015, the Defendants waited another week to allegedly mail out the "Notice of Unfounded Investigation/Assessments." The Iacopelli's both testified that neither received the notice. Although DSS knew the Iacopelli's were represented by counsel, no Notice was sent to their counsel. This was likely due to DSS and Williams sending it to the wrong address and failing to copy counsel. Defendant Williams could provide no proof that she mailed the notice, except that she remembered leaving the notice in the mail room. (Williams Depo. at. P 48:1-7). Further, and more importantly, Williams violated DSS written policy by failing to conduct "a face-to-face meeting with the family prior to sending out the Notice letter." *See*, (Report of Mike Corey at p. 15 § 7)(Quoting SCDSS Policy Manuel page 78).

DSS "unfounded" the case as a Category II Unfounded Report. *See*, (SCDSS Form 3065 Bates Num. 0026). A Category II unfounded report finds: "The investigation/assessment did not

9

produce a preponderance of the evidence that the child is an abused or neglected child." *Id*. A Category I unfounded report finds: "Abuse and neglect was ruled out by the investigation/assessment." *Id*. Neither Defendant Williams or her supervisor Kyra Speller could give any objective justification as to why Joel's case was unfounded as a Category II instead of a Category I. *See*, (Williams Depo. at p. 54:7-14).   Because of this "finding" Mr. Iacopelli's name and biographical information is kept for at least five (5) years in a central registry maintained and accessed by DSS. *See*,  (Speller Depo. at 13:1-24).

## II.    SUMMARY JUDGMENT STANDARD:

For sake of brevity, the Plaintiffs generally agree with the cases and standards as set forth in the Defendants' Motions as to the standards for Summary Judgment, with the addition of *Miller v. Leathers*, 913 F.2d 1085 (4th Cir. 1990), cert. denied, 498 U.S. 1109 (1991)(The Plaintiff is entitled to have the credibility of all his evidence presumed).   Plaintiff opposes the Defendants' Motions in all respects, particularly when viewed in the light most favorable to the Plaintiff,  and considering the vast number of disputed material facts.

## III.    ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT:

### A.    DSS NOT ENTITLED TO SUMMARY JUDGMENT:

For the reasons set forth herein below, DSS (Entity) is not entitled to Summary Judgment under (1) the "public duty rule;" (2) DSS is not immune from liability for their  gross negligence under the South Carolina Tort Claims Act; and  (3) DSS is not immune pursuant to Section 63-7-400 of the South Carolina Code of Laws.

### 1.    THE PUBLIC DUTY-RULE IS INAPPLICABLE TO THE FACTS OF THIS CASE

AS A DEFENSE:

The public duty rule does not apply to the facts of this case, because of DSS's actions and omissions it owed a "special duty," to the Plaintiffs, rather than a general duty to the public at large. In order to show that the defendant owed the plaintiff a duty of care arising from a statute, the plaintiffs must show two things: "(1)  that the essential purpose of the statute is to protect from the kind of harm that the plaintiff has suffered; and (2) that he is a member of the class of persons the statute is intended to protect." *Jensen v. S.C. Department of Social Services,* 297 S.C. 323, 377 S.E.2d 102 (S.C. Ct. App. 1987).  An affirmative duty only exists if created by statute, contract, relationship, property interest, or some other circumstance.  *Id*.

A special duty exists if: (1) an essential purpose of the statute is to protect from the particular kind of harm (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know of the likelihood of harm to members of the class if he fails to do his duty; and (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office. *Jensen*, 377 S.E.2d at 105.

Section 63-7-10(A) of the South Carolina Child Protection and Permanency Act provides that, "[a]ny intervention by the State into *family life* on behalf of the children must be guided by law, by strong philosophical underpinnings, and by sound professional standards for practice."  Section 63-7-10(A)(1) provides, "[p]arents have the primary responsibility for and the primary resource for their children."  Section 63-7-10(A)(2) provides, "[c]hildren should have the opportunity grow up in a *family unit* if at all possible."  Section 63-7-10(A)(11) provides. "[o]nly a comparatively small

11

percentage of current child abuse and neglect reports are criminal in nature or will result in the *removal* of the child or *alleged perpetrator*." (Emphasis added).

South Carolina recognizes by statute the sanctity of the family unit and carefully tailored restraints on the Department of Social Services in dealing with families. Section 63-7-10(A)(13) provides, "[t]he Department of Social Services staff who investigates serious child abuse and neglect reports with law enforcement must be competent in law enforcement procedures, fact finding, evidence gathering, and effective social intervention and assessment." Section 63-7-10(B)(4) further imposes a duty on DSS when becoming involved with family lives to: "establish fair and equitable procedures, **compatible with due process of law** to intervene in *family life* with due regard to the safety and welfare of *all family members*." (Emphasis added). Title 63, Chapter 7 of the Child Protection and Permanency Act specifically recognizes that DSS, through the acts or omissions of their employees may be subject to being sued and grants only a limited immunity to DSS. Section 63-7-400 provides that if the DSS employee was, wilful, wanton or *grossly negligent* the limited grant of statutory immunity does not apply.

DSS argues three reasons why there is no special duty to the Iacopelli family. Each argument is addressed herein below:

a.    The Plaintiffs cannot show that they are members of the protected class:

DSS states in its Motion that: "The Child Protection [and Permanency] Act itself and the ruling in *Jensen*[1] show that the essential purpose of the Child Protection [and Permanency] Act is

---

[1]

*Jensen* dealt with a specific portion of the Act and does not stand for any broad or sweeping pronouncements on all the intricacies and statutory permutations of the Act laid out in 18 subparagraphs.

[*sic*] protect against harm to children, not to protect against harm to adults as the result of being subjected to a DSS investigation." *See* [ECF Dkt. Entry 100-1 at p. 21 Sub ¶ 1]. DSS avers that the Act is solely for the protection of children, not to prevent harm to the parents. DSS ignores Section 63-7-10(B)(4) which imposes a duty on DSS when becoming involved with family lives to: "establish fair and equitable procedures, ***compatible with due process of law*** to intervene in ***family life*** with due regard to the safety and welfare of ***all family members.***" (Emphasis added). It is abundantly clear that the legislature looks at the family unit as a whole, parents included. Once DSS decided to remove Mr. Iacopelli from his home and grant him only supervised "visitation," DSS unnecessarily intervened into the Iacopelli family life.

Likewise, at the whim of DSS, Mrs. Iacopelli had to agree to assume additional duties and responsibilities, the breach of which could land her in jail. Mr. and Mrs. Iacopelli are "family members" within the meaning of the Act. A protected class of persons need not be so specific as to name any individual. It is sufficient that an identifiable class of persons can be reasonably identified within the contours of the statute creating such a class. *Steinke v. S.C. Dept. of Labor, Licensing and Regulation*, 336 S.C. 373, 520 S.E.2d 142 (1999). The purpose of the Act as set forth is to do more than merely protect children, but to protect, defend and preserve the integrity of a family as a whole. Unwarranted intrusions and restrictions placed on the parents rights to raise their children as they see fit necessarily diminishes the children's welfare as defined in the Act.

    b.    <u>The Plaintiffs cannot show the legislature intended to create a private right of action for unfounded cases</u>:

Next, DSS argues that because that the Plaintiffs are not entitled to an administrative appeal of a finding in which the allegation of abuse or neglect is "unfounded," that the Act does not create

a private right of action against DSS.  *See,* [ECF Dkt. Entry 100-1 at p. 21-22].  The Plaintiffs' do

not seek to appeal DSS's finding that the their case should have been unfounded.  The crux of the

Plaintiffs' claims are that DSS abused its authority in removing Mr. Iacopelli from his home without

evidentiary support.   Not only should the case against the Iacopelli's have been unfounded, it never

should have been brought *ab initio*.  The Plaintiffs seek damages for substantial and unwarranted

interference into their family life, bonds with their children, and with their interaction with each other.

By the enactment of Section 63-7-400, the South Carolina legislature specifically recognized a private

right of action against DSS if it or its employees acted in wilful, wanton, reckless, <u>or</u> grossly negligent

manner in the interference with "family life" and "family members."

      c.    <u>The Plaintiffs cannot show a public officer would have reason to know</u>
            <u>unfounding a case against a parent could subject them to suit by the parent</u>:

As stated in subsection "b" *supra* the Plaintiffs do not bring suit because DSS unfounded the

case against them.  The Plaintiffs bring suit for the unwarranted and unreasonable intrusion into their

family life, home and hearth by Williams' and DSS's actions and/or omissions which caused the

Iacopelli family extreme emotional and financial damages.  Defendant Williams and DSS "unfounded"

this case on exactly the same information (none),  and the same evidence (none)  that they opened

the case with and subjected this family, by extreme coercion to the "voluntarily" removal of Mr.

Iacopelli from his home and the requirement that Mrs. Iacopelli supervise any "visits" with his

children.   By the clear mandates of the Act, any reasonable DSS worker would have known or

should have known that the Act protects the integrity of the family as a whole.  Any reasonable DSS

worker would have known or should have known that the Act created liability for the acts, errors

and/or omissions by DSS which are done in a grossly negligent manner. *See*, §63-7-400 of the S.C.

Code of Laws.   The Defendants misperceive the harm and havoc that they have caused this family.

2.    DSS IS NOT ENTITLED TO SUMMARY JUDGMENT PURSUANT TO SC CODE Ann. §63-7-400:

The grant of limited immunity provided to DSS employees is inapplicable if the employee's conduct was grossly negligent.  SC Code Section 63-7-400.  The Defendants correctly point out that assertion of immunity under the Act is an affirmative defense that must be proven by the Defendants. The Defendants here limit their definition of "gross negligence" as the failure to exercise slight care, and have argued that the Defendant at least exercised "slight" care in their removal of Mr. Iacopelli from his home.

As it relates to the S.C. Tort Claims Act and Section 63-7-400, the definition of gross negligence is: "the absence of care that is necessary under the circumstances." *Proctor v. S.C. Dept. of Environmental Control*, 628 S.E.2d 496 (S.C. Ct. App. 2006); *See also*, *Etheredge v. Richland County Sch. Dist. One*, 341 S.C. 307, 310, 534 S.E.2d 275,277 (2000); *Jinks v, Richland County*, 355 S.C. 341, 344, 585 S.E.2d 281, 283 (2003)("Gross negligence means the absence of care necessary under the circumstances").  Gross negligence is ordinarily a mixed question of law and fact. *Clyburn v. Sumter County Sch. Dist. No. 17*, 317 S.C. 50, 53, 451 S.E.2d 885,887 (1994).  "In most cases, gross negligence is a factually controlled concept whose determination best rests with the jury." *Faile v. S.C. Dept. of Juvenile Justice*, 350 S.C. 315, 331-332, 566 S.E.2d 536, 544 (2002).

The DSS Policy Manual requires that a Comprehensive Risk Assessment must be completed by the caseworker. *See*, (DSS-CPS Manuel at p. 29-30).  The procedure for intake requires the caseworker to: "Complete a full risk assessment of the family which includes the Risk Factors in the home, vulnerability of each child, protective capacity of caregivers (cognitive, behavioral and

15

emotional), and family strengths." *Id.*  The Manual specifically directs the caseworker that: "There should NOT be any blanks in the Risk Matrix after intake."  *Id.* (at p. 30)(Emphasis in Original). Items 3-15 on the intake assessment form are completely "blank." *See*, (DSS Bates No. 11-16, DSS Form 3088).

Section 710.01 of the DSS Manuel, "provides specific intake screening criteria and standards for decisions at intake." (DSS-CPS Manuel at p. 38).  Defendant Williams did only one Risk Assessment, *i.e.* she interviewed Marianne and the Iacopelli children.  Williams learned from Mrs. Iacopelli and the children that their was no abuse or neglect whatsoever of any of the Iacopelli children.  In order to refer a case for investigation, "[t]here must an allegation or a description of actual harm that has occurred to a "child" or is concurrently occurring with the report or significant risk of harm in the immediate or foreseeable future to the "child" as defined by §63-7-20. (DSS-CPS Manuel at p. 44).  "The person alleged to have injured the child must be a parent, guardian, caretaker or other person defined in SC Code of Laws §63-7-20." *Id.*  First of all, there was NO allegation that Mr. Iacopelli harmed any of his children.  Defendant Williams specifically ruled out any harm to the Iacopelli children, yet imposed an "In-Home" Safety Plan contrary to the ACT and DSS written policy.

The Plaintiff's expert, Mike Corey, found that the criteria to issue a Safety Plan for the Iacopelli family was not met by DSS policies and procedures. *See*, (Report of Mike Corey at p. 13). DSS-CPS Manuel states: "[a] Safety Plan is a specific and concrete strategy for controlling threats of *imminent* harm to a child[ren] and/or supplementing protective capacities of parents. The Safety Plan is implemented immediately when parents' protective capacities are not sufficient to manage *immediate* safety threats during the completion of the investigation." (DSS-CPS Manuel Policy

16

719.02 at p. 83-84)(Emphasis added).

Defendant Williams actually found Mrs. Iacopelli's protective capacities were, in fact, *sufficient*. "I felt like Mrs. Iacopelli could protect the children until we can see what's further going on, because all we have is these allegations right now to go off of." (Williams Depo at p. 16:2-5). Williams knew Mr. Iacopelli was in custody when she demanded Mrs. Iacopelli sign the Safety Plan and that there was no allegation of abuse or neglect of the Iacopelli children. So Williams knew there was no immediate threat of harm, the Iacopelli children were safe and that Mrs. Iacopelli had sufficient capacities to care for her children. The Defendants harp on the fact that they did not remove the Iacopelli children, so no big deal. What the Defendants fail to recognize is that they *removed* Mr. Iacopelli from his home when he was released from State custody (Defendants did not even know Mr. Iacopelli had been released).

The unnecessary Safety Plan by it terms only allowed Mr. Iacopelli supervised "visitation," necessarily implying that he could only "visit" his children with Marianne's consent and supervision. The DSS-CPS Policy and Procedure Manuel [p. 86-87] defines an "In-Home" Safety Plan as:

> "The child remains in the home and a perpetrator, if one parent, leaves the residence allowing the non-offending parent and the Child Protector to live in the home with the child. In this situation, the Safety Plan must provide the name of **a Child Protector, other than the non-offending parent**, who will ensure compliance with the perpetrator leaving the home or will contact DSS if the perpetrator returns during the investigation." (Emphasis in Original).

A DSS "In-Home" Safety Plan requires the alleged perpetrator to leave the residence. The terms of the Safety Plan in this case required Marianne: "to supervise visits between father (Joel Iacopelli) and children until investigation is completed." (DSS Form 3087, DSS Bates No. 0019). It is clear that Defendant Williams, and her supervisors were grossly negligent and plainly incompetent as to the

17

rules and regulations in regard to Safety Plans and its effect on families and consciously indifferent to the Iacopellis' rights. Williams designated and saddled Marianne with the responsibilities as the "Child Protector," notwithstanding the fact that DSS policy prohibits appointing Marianne as the "Child Protector" for an In-Home plan. The fact that DSS did not require a "Child Protector" is further evidence that no Safety Plan was necessary in the first place.

The Defendants breached their duty to notify Joel Iacopelli, or his counsel, as to the terms of the Safety Plan at any time, in custody or out of custody. Williams was ordered by her supervisors to make contact with Joel Iacopelli and she failed or refused to do so. Further, Williams violated DSS written policy by failing to conduct "a face-to-face meeting with the family prior to sending out the Notice letter." *See*, (Report of Mike Corey at p. 15 § 7)(Quoting DSS Policy Manuel at page 78). This policy is presumably in place to insure that families, such as the Iacopellis, whose lives have been intrusively effected by DSS receive <u>actual notice</u> that the case has been unfounded and that the Safety Plan has terminated. The Defendants breached this duty required by DSS policy. As to the Notice that was allegedly mailed, the Defendants note in their Motion that, "Mrs. Williams wrote the zip code as 29907, and the Plaintiff's actual zip code is 29906." [ECF Dkt Entry No. 100-1 at p. 24 ¶ 2]. The Plaintiffs' actual zip code is 29907 (Lady's Island, SC) and Mrs. Williams wrote 29906 on the Notice (Burton, SC). On the Safety Plan, the Iacopellis' zip code of 29907 was correctly recorded by Williams, and she went to the residence on Lady's Island. (Lady's Island, SC is in the 29907 zip code). The failure to follow DSS policy combined with the wrong zip code on the Notice letter, assuming there really was one at the time[2], is clear evidence that the Defendants were grossly

---

[2]

In addition to the incorrect address, the Notice Letter does not reference the children, is not signed by a supervisor and is not "CC'ed" to anyone. *See*, (DSS Bates No. 0026).

negligent in this respect as well as the other policy violations discussed above.

With respect to the DSS investigation, the Defendants claim that they used slight care in conducting the investigation. The Defendants compartmentalize their investigation, focusing only on the post-Safety Plan component. As discussed above the Defendants were grossly negligent and consciously indifferent to the Iacopelli family's rights by failing to follow DSS policy in gathering information necessary to determine whether a Safety Plan was needed at all. The Safety Plan, removing Mr. Iacopelli from his home violated DSS written policy. The Safety Plan as imposed upon Mrs. Iacopelli likewise violated DSS written policy, as discussed above. Gross negligence is: "the absence of care that is necessary under the circumstances." *Proctor v. S.C. Dept. of Environmental Control*, 628 S.E.2d 496 (S.C. Ct. App. 2006); *See also*, *Etheredge v. Richland County Sch. Dist. One*, 341 S.C. 307, 310, 534 S.E.2d 275,277 (2000); *Jinks v, Richland County*, 355 S.C. 341, 344, 585 S.E.2d 281, 283 (2003)("Gross negligence means the absence of care necessary under the circumstances").

Further, gross negligence is also defined as the, "intentional, conscious failure to do something which is incumbent upon one to do, or the doing of a thing intentionally that one ought not to do. *Proctor*, 626 S.E.2d at 504. It was incumbent upon Williams to "Complete a full risk assessment of the family which includes the Risk Factors in the home, vulnerability of each child, protective capacity of caregivers (cognitive, behavioral and emotional), and family strengths." The Manual specifically directed Williams to insure that: "There should NOT be any blanks in the Risk Matrix after intake." *Id*.(at p. 30)(Emphasis in Original). Williams failed to gather the information for Items 3-15 on the intake assessment form. *See*, (DSS Bates No. 11-16, DSS Form 3088). Section 710.01 of the DSS Manuel, "provides specific intake screening criteria and standards for decisions at intake." (DSS-CPS

Manuel at p. 38).  Williams failure to adhere to DSS policy on the risk assessment left her with no objective criteria to make a risk assessment.

Williams concocted a Safety Plan that violated DSS policy in a number of respects as discussed above. Additionally, Williams' supervisor apparently approved the in-home Safety Plan. This is evidence that DSS as an entity, either does not follow DSS policy or does not know what the policies are with respect to removal of a parent from his home.   These conscious failures led to the removal of Mr. Iacopelli from his home, wife and children, without any objective criteria on which to base this action by Williams. Marianne lost the society, comfort and aide of her husband.  The Iacopelli children suffered as well from the separation of their father and strain on their mother. Williams and  DSS ignored the mandate of  Section 63-7-10(B)(4) which imposes a duty on DSS when becoming involved with family lives to: "establish fair and equitable procedures, ***compatible with due process of law*** to intervene in ***family life*** with due regard to the safety and welfare of ***all family members***."  (Emphasis added).

Williams failed to interview Mr. Iacopelli and inform him of the requirements imposed on him by the Safety Plan, even after she was told to do so.  Moreover, DSS failed to consider the fact that there was no allegation of harm to the Iacopelli children whatsoever.   The only pre-Safety Plan assessment that Williams accomplished showed that the Iacopelli children had suffered no abuse, felt safe, were able to articulate and distinguish "good-touch from bad-touch, knew how contact help if they needed it, were in no *immediate* threat of harm and that Marianne was a loving and competent protector of her children.

As to the *post hoc* investigation, the Defendants disingenuously blame the failures of Williams to interview and assess Mr. Iacopelli was because their attorney told her not to have contact *directly*

20

with Iacopellis.  Nonsense.  Williams was well familiar with dealing with parents who are represented by counsel. Williams testified:

> Q      **Okay. And you do not recall that one of the pamphlets specifically informed parents that they had a right to counsel, and even specifically informs them if they can't afford counsel, that arrangements would be made to try and get them counsel?**
> A      Yes.
>
> Q       **Okay. So Mrs. Iacopelli, by having an attorney, didn't do anything wrong in DSS's eyes, did they -- did she?**
> A Oh, no. No.
>
> A No, sir.
>
> Q      **All right. And you say it's common, or let's maybe say it's not uncommon, that parents do have counsel, and that if you need to contact children or schedule appointments, that you do that through counsel, and that's not unusual, is it?**
> A No.

(Williams Depo. at 34:15 -35-15).  DSS and Williams have access to an in-house staff attorney lodged in their office building.   In the event parents, represented or not, are not cooperating in an investigation,  DSS has several options; (1) the DSS caseworker can contact the parent's attorney; (2) the staff attorney can contact the parent's attorney in an attempt to resolve any issues; and/or (3) DSS can petition the Family Court to compel compliance with their investigations.  Of course, if the latter were to occur, the parents would have the basic due process rights of: (1) notice; (2) a hearing; and (3) a meaningful opportunity to be heard prior to a Court ruling.  Quite simply, Williams was finished with her direct involvement with the Iacopellis as of July 13th 2015, the day she descended upon the Iacopelli household.  *See*,  (Williams Depo. at 33:8-15):

21

> "Q. **And in this case, you did not follow up with any - - wanting to do any further interviews with any of the Iacopelli children or Mrs. Iacopelli; is that correct?**
>
> A. I thought that they were safe, That's correct.
>
> Q. **Okay. So you didn't need to do anything further?**
>
> A. Not with the children and not with Mrs. Iacopelli."

The Defendants aver that they, "obtained criminal background checks on the Plaintiffs." [ECF Dkt. Entry 100-1 at p. 25 ¶ 1]. This averment is only half correct. Williams did run a NCIC on Mr. Iacopelli on July 15th 2015. She already knew about Mr. Iacopelli's arrest and charge. What Williams would have learned, if she had read the NCIC history, was that Joel (44 years old) had no prior convictions for anything, had no prior arrests for anything and had no outstanding wants or warrants (a recognized risk factor that was negative). Further, if Williams had conducted a reasonable and "thorough" investigation, as required by the Risk Assessment Matrix form, she would have learned that the Iacopellis do not consume alcohol nor use drugs (a recognized risk factor that was negative). Had Williams made a required risk assessment she would have known that Joel and Marianne had been married, continuously, for over fifteen (15) years at the time. (a recognized family strength factor that was positive). Had Williams made a required risk assessment analysis she would have known that the Iacopelli family had no issues with domestic abuse (a recognized risk factor that was negative and a recognized family strength factor that was positive).

Inexplicably, Williams did not run a NCIC criminal history check on Marianne Iacopelli, who Williams deemed as a "child protector" with acceptable skills to care for the Iacopelli children during the investigation. Williams, in violation of DSS policy did not require a, "non-offending parent," to reside in the home and monitor the In-House Safety Plan. These facts are clear evidence that no disruptive Safety Plan was necessary at all. Mr. Iacopelli was removed from his home on vague and

arbitrary actions rather that the objective criteria required by not only DSS policy, but the Child

Protection and Permanency Act itself and the penumbras of the Fourth Amendment to the United

States Constitution. *See*, *Griswald v. Connecticut*, 381 U.S. 479 (1965).

The Defendants next complain, shirk off their responsibilities to monitor their Safety Plan and

attempt to bob, weave, cut and run and lay the blame for their failures on some unknown person(s)

or entity for the fact that they were not notified of Joel's bond hearing which occurred on July 23rd

2015. This is a clear admission that DSS and Williams paid no attention at all to their investigation

and failed to monitor their in-house Safety Plan, a plan which was forced upon the Iacopellis and

cleaved Mr. Iacopelli from his family. Williams' ill conceived Safety Plan removed Mr. Iacopelli

from his home, sequestered and dramatically interfered with his familial relationships. When

questioned about the July 23rd 2105 State Circuit Court's order allowing Mr. Iacopelli contact with

his children, Williams testified: (Williams Depo. at pp. 48:23 - 51:21):

> Q    **Okay. Now, you don't remember when you learned**
> **of the fact that Mr. Iacopelli was released from custody?**
> A    No.
>
> Q    **Okay. How did you become aware of the circuit**
> **court order that allowed him to have unrestricted contact**
> **with his children?**
> A    From the copy of the bond hearing, I think it
> was.
>
> Q    **Okay. And how did you get a copy of the bond**
> **hearing?**
> A.    I can't remember.
>
> Q    **When did you get a copy of the bond hearing?**
> A    I can't remember, sir.
>
> Q.    **Okay. Do you have a copy of the copy of the bond**
> **hearing?**

A     Will you -- I'm sorry.

**Q     Do you have -- in your record, in this DSS file,**
**Is there a copy of the judge's order in the bond hearing?**
WITNESS:    I'm so confused right now. I'm
          sorry.

**Q     All right. Let me -- let me back this up. You**
**said that you had reviewed a copy of the circuit judge's**
**bond form?**
A     Yes, sir.

**Q     All right. And where did you get that information from?**
**That document?**
A     I can't recall, but I remember reading over it.

**Q     Okay. Did you make that document a part of the**
**DSS case file?**
A     I can't recall.

**Q     Was that document discussed at the staffing?**
A     Yes.

**Q     All right. And what was discussed about that**
**document?**
WITNESS:    Well, if I can remember, we
          would've got that after -- I just can't remember when
          we got it, but it was discussed.

**Q     And what was discussed about it?**
A     The conditions of the bond.

**Q     And why was that discussed?**
A     Because of what it said.

**Q.    Well, why? What was the impact? What was the import?**
**What did it mean to y'all?**
A     I just wanted to get more clarity on what it
          meant.
**Q     Okay. And did you do that?**
A     I tried.

**Q     How did you try?**

A    I called Detective Bilyard, and he gave me a
     lady's phone number to get in contact with, and I remember
     leaving her a message.

Q    **And what lady was that? Who would that have
     been?**
A    I can't recall.

Q    **What type of position did she have?**
A    I can't recall.

Q    **Okay. And did you ever make contact with the
     lady?**
A    I just can't recall right now.

Q    **Okay. Was anything done to follow up the circuit
     court bond order?**
A    I think we discussed it in the legal staffing. I
     just can't recall.

DSS and Williams failed to document this aspect of their investigation. The import of this testimony

is clear evidence of DSS and Williams' *post hoc* reconstruction of an investigation that never was.

Defendant Williams testified as to the true extent of the DSS's post-Safety Plan investigation

as follows: (Williams Depo. at p. 52:2-5):

Q.    **"All right.  So your entire investigation concluded by
      going to the Iacopelli home, making some personal
      observations; correct?**
A.    Yes, sir."

Section 63-7-10(A)(13) provides, "[t]he Department of Social Services staff who investigates serious

child abuse and neglect reports with law enforcement must be competent in law enforcement

procedures, fact finding, evidence gathering, and effective social intervention and assessment."

Williams, and thus DSS clearly breached her duty of being competent and conducting a reasonable

pre-removal (of Mr. Iacopelli) and post-removal investigation required under the Act and DSS

policies.

The fact that DSS claims it had no notice of Mr. Iacopelli's bond conditions that he could have contact with his minor children on July 23rd 2015 and his eventual release on bond that occurred on July 24th 2015.  The fact that they had no notice of these events  is their fault, because they failed to monitor the in-house Safety Plan and failed to monitor Mr. Iacopelli, the supposed target of their investigation.  Williams obviously knew Mr. Iacopelli was in the Beaufort County Detention Center from multiple sources: Port Royal Police informed her; Mrs. Iacopelli informed her; Mr. Iacopelli's detention was reported in the media; the Detention Center has a web page listing current inmates; and, the Beaufort County Public Index posts bond information and the status of inmates.  Nowhere in the DSS file is any notation, dictation or discussion with reference to wanting to be noticed about Mr. Iacopelli's status of custody.  Further,  DSS could have used the S.C. Victim's Notification network (V.I.N.E.) which would require the Detention Center to notify DSS of Mr. Iacopelli's release. Since Mr. Iacopelli was in custody on July 13th 2015, there was no need for a Safety Plan. Any reasonable person, trained or not, would come to the conclusion that Mr. Iacopelli presented zero threat of harm to his children just based upon that powerful fact.  If Williams "felt"[3] there was a need for a Safety Plan, all it had to say was: "Mrs. Iacopelli is to immediately notify DSS upon Mr. Iacopelli's release from custody," rather than removing Mr. Iacopelli from his home and family.

The Defendants cite *Jensen v. Anderson County Dept. of Social Services*, 403 S.C. 615, 304 S.C. 195 (SC 1990) and  *Bass v. S.C. Dept. of Social Services*, 414 S.C. 558, 780 S.E.2d 252 (SC 2015) which concern DSS investigations which were grossly negligent and gave rise to liability. In

---

[3]

The word "felt" is used on purpose, since Williams had no objective criteria for issuing a Safety Plan, in the first instance.

26

both cases DSS was held accountable under the Child Protection and Permanency Act and the S.C. Tort Claims Act. In *Jensen*, the South Carolina Supreme Court held that the child abuse statutes impose a special duty on DSS social workers which may give rise to a private cause of action. *Jensen* was a wrongful death case brought by a <u>parent</u> for <u>her</u> damages as a result of the negligence of DSS in not conducting "an appropriate and thorough" investigation. The Defendants urge this Court to read the Child Protection and Permanency Act in a limited sense that: "parents have no right to complain about a [grossly negligent] investigation directed against the parent." *Jensen* holds otherwise. Further the Act specifically imposes a duty on DSS in Section 63-7-10(B)(4) to, "establish fair and equitable procedures, *compatible with due process of law* to intervene in ***family life*** with due regard to the safety and welfare of ***all family members.***" (Emphasis added). In order to follow the Defendants' logic, this court would have to rewrite Section 63-7-10(B)(4) to read: "establish fair and equitable procedures, *compatible with due process of law* to intervene in [family life][*strike and replace with*][**a child's life**] with due regard to the safety and welfare of [~~all family members~~.][*strike and replace with*][**any child**]." Therefore, the Iacopellis, are specifically included, as a protected class of persons in the Act's definition of "all family members."

> 3.    DSS IS NOT ENTITLED TO SUMMARY JUDGMENT PURSUANT TO SC CODE Ann. §15-78-60(4):

The Defendants claim that they are entitled to Summary Judgment pursuant to S.C. Code Section 15-78-60(4) of the South Carolina Tort Claims Act. The Defendants cite the case of *Adkins v. Varn*, 312 S.C. 188, 439 S.E.2d 822 (1993) which dealt with a general animal control ordinance in Greenville County. *Adkins* does not apply to this case because the plaintiff in that case complained the County generally did not appropriately enforce the ordinance, and thus was negligent when the

27

plaintiff's child was attacked by some dogs.  The South Carolina Supreme Court found that the

ordinance did not create a special duty to an identifiable class of persons, but rather to the public at

large.  Conversely, in both *Jensen v. Anderson County Dept. of Social Services*, 403 S.C. 615, 304

S.C. 195 (SC 1990) and  *Bass v. S.C. Dept. of Social Services*, 414 S.C. 558, 780 S.E.2d 252 (SC

2015) the South Carolina Supreme Court held that the Child Protection and Permanency Act created

and identifiable class of persons and that DSS could be held liable to plaintiffs to whom they harm

under the Act.

In *Clark v. S.C. Dept. of Public Safety*, 353 S.C. 291, 578 S.E.2d 16 (S.C. Ct. App. 2002),

the Court of Appeals rejected the Department's assertion of immunity pursuant to §15-78-60(4).  The

evidence showed that the Department's officers  failed to follow or enforce it its written policies on

motor vehicle chases.  The plaintiff was injured when the police,  who were chasing a motor vehicle

that crashed into him.  The car chase as executed violated the Department's policy on motor vehicle

pursuits.  The Court of Appeals in denying the Department immunity pursuant to §15-78-60(4)

stated:

> "In denying the Department's directed verdict motion at the end of the
> plaintiff's case, the trial court found the Department was not entitled
> to absolute immunity under §15-78-60(4) for the failure to enforce
> any law or written policy, stating 'I don't think it was a policy
> violation, I think it was a violation of the standard of care that they
> were supposed to provide to the public.'"

If the government violates operational policies, those policies set a standard of care that may be used

as evidence of the government's negligence. *Id*. *See also, Proctor v. D.E.H.C.,* 628 S.E.2d 496

(2006); *Jackson v. S.C. Dept. of Corrections*, 301 S.C. 125, 390 S.E.2d 467 (S.C. Ct. App. 1989);

*Jensen v. Anderson County DSS*, 304 S.C. 195, 403 S.E.2d 615 (1991).

B.    PLAINTIFFS' 42 USC §1983 CLAIMS AGAINST WILLIAMS:

1.    Nature of the Constitutional Claims against Williams:

Initially, the Defendant Williams correctly states the nature of the Plaintiffs claim is the "restrictive conditions [forced] on their family relationships in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution." [ECF Dkt. No. 100-1 at p. 11]. The Defendant thereafter continually re-frames the Plaintiffs' issue as: "no constitutional right to be free from a DSS investigation," "no right to be free from a DSS decision which unfounded a case of abuse or neglect," "no right to a speedy investigation," "no right to a 'thorough' investigation," "no right to be free from a threat of removing a child, when no removal of a child occurred." The Plaintiffs core claim in this respect is the unconstitutional removal of Mr. Iacopelli from his home without due process of law and the government's interference with parent-child relationship and family structure. This restructuring of the Iacopelli household and imposition of monitoring requirements on Mrs. Iacopelli likewise interfered with her parent-child relationship and family structure.

2.    Qualified Immunity Analysis:

Qualified immunity, "is an accommodation by the courts to the 'conflicting concerns' of, on one hand, government officials seeking freedom from personal monetary liability and harassing litigation and, on the other hand, injured persons seeking redress for the abuse of official power." *Anderson v. Greighton*, 483 U.S. 635, 638 (1987). "As such, 'whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness' of the action . . .assessed in light of the legal rules that were 'clearly established' at the time the action was taken." *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994)( *Anderson* 483 U.S. at 639); *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818-19.

29

There can be no doubt that, "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Hodge*, 31 F.3d at 163(quoting from *Moore v. City of East Cleveland*, 431 U.S. 494, 503). "Much like the foundational concept of individual privacy, *see Roe v. Wade*, 410 U.S. 113, 152-53 (1973), the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." *Id*. 31 F.3d at 163. "The bonds between parent and child are, in a word sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons." *Jordan by Jordan v. Jackson*, 15 F.3d 333,343 (4th Cir. 1994).

The Fourth Circuit has clearly defined "actionable violations of the familial privacy right to encompass only those instances where state officials' actions were directly aimed at the parent-child relationship" *Hodge*, 31 F.3d at 163. This right implicates the "most essential and basic aspect of familial privacy - - the right of the family to remain together without the coercive interference of the awesome power of the state." *Id*. A state official's actions cannot drive a wedge into a family and threaten its very foundation or erode the family's solidarity internally or impair a family's ability to function. *Id*. Thus, the Fourth Circuit has clearly defined and limited the contours of the familial privacy and due process rights in this respect. The actions of the Defendant forced Mr. Iacopelli from his residence and family. Williams was specifically put on notice of these rights pursuant to the Child Protection and Permanency Act §63-7-10(B)(It is the purpose of this chapter to: (4) establish fair and equitable procedures, compatible with due process of law to intervene in family life with due regard to the safety and welfare of all family members."

The Plaintiffs recognize that the State has a legitimate interest in curtailing the abuse or

neglect of its minor citizens. In this case however, "[t]he statist notion that governmental power should supercede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham v. J.R.*, 442 U.S. 584, 603 (1979)(emphasis in original). Williams' action in requiring a Safety Plan which removed Mr. Iacopelli from his home was arbitrary, capricious and unnecessary under DSS policy. Williams was required to make a threat of harm assessment and she failed to do so. The threat of harm analysis required by DSS is to insure that the agent's decision to remove a family member comports with due process of law.

Williams failed to examine and consider the facts with which she was confronted. First, there was no allegation of a threat of harm to the Iacopelli children at all. The Plaintiffs do not take issue with Williams contacting Mrs. Iacopelli at her residence. Tenuous or not, Williams acted on a request from law enforcement to visit the Iacopelli residence. Once Williams was there she interviewed Mrs. Iacopelli and the children. Mrs. Iacopelli presented well, denied any form or threat of abuse or neglect and Williams objectively formed the opinion that Mrs. Iacopelli was good person and very capable of protecting her children in a safe environment. Each of the four children were interviewed and visually examined. All denied any abuse, all appeared and presented as neat, clean and healthy. There were no reported communication issues with the children who were ages 12 through 5 years old. All the children, from home and school, knew "good touch-bad touch" scenarios, knew how to call 911 if needed and all reported that they were safe and felt secure with their parents. The residence was well maintained. Mrs. Iacopelli told Williams that the charge against Mr. Iacopelli was false and that there was video from her home and the church that prove he was innocent of the allegation that was reported to Port Royal Police Department.

Mr. Iacopelli was never interviewed by Williams, even though she was ordered to make

contact and conduct an interview. Williams knew Mr. Iacopelli was in the Beaufort County Detention Center (a block from Williams' DSS office and on the same street) pending a bond hearing.

In order to comport with DSS policies and due process of law prior to removing a family member, Williams was required to conduct a risk assessment. The DSS Policy Manual requires that a Comprehensive Risk Assessment must be completed by the caseworker. *See*, (DSS-CPS Manuel at p. 29-30). The procedure for intake requires the caseworker to: "Complete a full risk assessment of the family which includes the Risk Factors in the home, vulnerability of each child, protective capacity of caregivers (cognitive, behavioral and emotional), and family strengths." *Id.* The Manual specifically directs the caseworker that: "There should NOT be any blanks in the Risk Matrix after intake." *Id.* (at p. 30)(Emphasis in Original). Items 3-15 on the intake assessment form are completely "blank." *See*, (DSS Bates No. 11-16, DSS Form 3088).

Section 710.01 of the DSS Manuel, "provides specific intake screening criteria and standards for decisions at intake." (DSS-CPS Manuel at p. 38). Williams breached her obligation to comport with due process of law by failing to gather objective information pertinent and necessary to making an informed risk assessment. Williams, without the benefit of objective criteria to make an informed risk assessment, arbitrarily assigned a "6 out 10" threat of harm.

There was no threat of imminent harm because Mr. Iacopelli was held in jail on July 13th 2015. Rather than complete the risk assessment matrix, interview Mr. Iacopelli or interview "collateral sources" (neighbors, teachers, health care professionals[4] or other family members) to verify or dispel any concerns, Williams coerced Mrs. Iacopelli into signing a make-shift Safety Plan that was in

---

[4] Williams did identify the children's primary health care physician and obtained a signed a HIPPA release. Williams, however, never contacted any health care provider listed.

violation of DSS policy and did not comport with due process of law. Williams was required to interview "other family members" and "known collaterals." (SC DSS Policy Manuel at p. 65-71, 73-74). Without any legal action Williams fashioned an unlawful plan that drove Mr. Iacopelli from his home during the DSS investigation. Williams never monitored the plan or reassessed the Safety Plan as she promised Mrs. Iacopelli, even when Mr. Iacopelli was released from the Detention Center. Mr. Iacopelli had to move in with his parents for several weeks. Mrs. Iacopelli was informed by Williams that she [Mrs. Iacopelli] could be jailed and her children placed in foster care if she failed to keep the terms of the Safety Plan.

Williams should not be entitled to a claim of qualified immunity, because her actions in removing Mr. Iacopelli from his home and family was not objectively reasonable. Williams was either plainly incompetent or she knowingly violated DSS policy, the Child Protection and Permanency Act and the Iacopelli's right to familial privacy and their child-parent relationships. Williams' action was not a "bad guess in a gray area." The Act, DSS policy and Fourth Circuit law provided Williams with sufficiently clear guidance of what conduct violates protected rights concerning the child-parent relationship. If Williams had followed policy and gathered the required information of the risk assessment matrix, prior to removing Mr. Iacopelli from his home, she would not have to make a "bad guess" or any guess, but rather an informed opinion based upon objective criteria. Williams had clear guidance on the information she needed to acquire on the pre-printed DSS form she left completely "blank" in contravention of DSS policy.

The Defendant Williams states in her qualified immunity analysis: "[a]ll the Fourth Circuit cases dealing with DSS workers have involved removal of the child from the parents, which simply did not happen in this case." [ECF Dkt. No. 100-1 at p. 13]. The Iacopelli children were removed

33

from Mr. Iacopelli because the Safety Plan required him to move out of his house and only "visit" his

children. A DSS "In-Home" Safety Plan requires the "offending household member" to leave the

children's residence during the investigation. The DSS-CPS Policy and Procedure Manuel [p. 86-87]

defines an "In-Home" Safety Plan as:

> "The child remains in the home and a perpetrator, if one parent, leaves
> the residence allowing the non-offending parent and the Child
> Protector to live in the home with the child. In this situation, the
> Safety Plan must provide the name of **a Child Protector, other than
> the non-offending parent**, who will ensure compliance with the
> perpetrator leaving the home or will contact DSS if the perpetrator
> returns during the investigation." (Emphasis in Original).

A DSS "In-Home" Safety Plan requires the alleged perpetrator to leave the residence. There never

was an allegation that Mr. Iacopelli abused any of his children. Further Williams reinforced to Mrs.

Iacopelli that Mr. Iacopelli could not reside in the home, but only had supervised "visitation" the

frequency of which was left to Mrs. Iacopelli's discretion. There was a removal from the home in

this case, not the children, but the father. This decision made by Williams to remove Mr. Iacopelli

was unilateral. The removal decision was not based upon objective criteria. There was no imminent

danger or emergency. The only basis for barring Mr. Iacopelli from his home and family was an

allegation of abuse allegedly directed at a non-household member that did not, as alleged, occur

anywhere near the Iacopelli homestead. On the initial (and only contact) Williams was able to

objectively rule out any threat of harm that may have existed by interviewing Mrs. Iacopelli and the

children.

The Defendant Williams claims a number of times that the Iacopellis do not have a right to

be free from a DSS investigation. The Plaintiffs agree with this proposition. The Plaintiffs, however,

have a right to be free from unwarranted state interference and substantial violations of their familial

rights as clearly defined in *Hodge*.   As pointed out by the Defendant, Mr. Iacopelli was in jail, but was released on bond on July 24th 2015.  DSS did not close its case until August 17th 2015.  Williams was required by DSS policy to have a "face-to-face" meeting with the Iacopellis prior to sending a Case Determination letter.  (SC DSS Policy Manuel at p. 78).  This did not occur, and the only written correspondence, if it was really sent,  was addressed incorrectly.

Before a Safety Plan can be imposed, Williams, as the case manager, was required to objectively identify certain and specific criteria.

      a.     The case manager needs to identify a Present or Impending danger threat that places the child or children in danger;

      b.     The case manager has to determine that a Safety Plan can control the effects of the Present or Impending Danger threats identified; and

      c.     The case manager has to determine that the parent/caregiver's Protective Capacities are insufficient to control the Danger threats that have been identified.

(SC DSS Policy Manuel at pp. 24, 45-47 and 83-84); *See also* (Corey Expert Report at p. 13 for further discussion and opinion).  In this case Williams knew that there was no "present" danger because Mr. Iacopelli was in jail on July 13th 2015.  The sole piece of information possessed by Williams was that Mr. Iacopelli was accused of sexually abusing an unrelated minor at church two weeks prior to her involvement.  Williams from the start objectively ruled out "impending" danger because Mrs. Iacopelli denied any such threat and none of the Iacopelli children reported any abuse whatsoever and felt safe in their home.  Further, the interviews of the children showed that each were able to articulate that they knew what "good touch-bad touch" in the area of sexual abuse meant.  Williams had to objectively determine that a Safety Plan can control the effects of the Present or Impending Danger threats identified.   There simply were no threats identified during the home

interviews with Mrs. Iacopelli and the children. Williams had to determine that the parent/caregiver's (Mrs. Iacopelli) Protective Capacities are insufficient to control the Danger threats that have been identified. Williams determined just the opposite: that Mrs. Iacopelli was a loving, caring, competent caregiver and protector of her children. Williams completely violated DSS policies and protocols which were in place, presumably to prevent unwarranted intrusions into the sanctity and security of a family. These policies and procedures are meant to prevent the state from abusing the mighty power of its sword to cleave fathers from their children, wives and security of their home.

3.     The Facts Show That Williams' was Objectively Unreasonable by her Actions, Incompetence and Omissions:

The Defendant states that the Fourth Circuit has, "specifically rejected the contention that they very statute at issue in this case-the South Carolina Child Protection [and Permanency] Act-creates substantive rights enforceable through a section 1983 action." [ECF Dkt No. 101-1 at p. 15]. It is axiomatic that state statutes do not *create* federal constitutional rights. The Act, however, specifically provides fair notice to DSS workers that they must employ, "fair and equitable procedures, *compatible with due process of law* to intervene in family life with due regard to the safety and welfare of all family members**.**" *See*, §63-7-10(B)(4). The substantive rights to be respected and followed are found in the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

The constitutional harm to the Iacopellis in this case is readily identifiable. The Fourth Circuit has clearly defined "actionable violations of the familial privacy right to encompass only those instances where state officials' actions were directly aimed at the parent-child relationship" *Hodge*, 31 F.3d at 163. This right implicates the "most essential and basic aspect of familial privacy - - the

36

right of the family to remain together without the coercive interference of the awesome power of the state." *Id*. A state official's actions cannot drive a wedge into a family and threaten its very foundation or erode the family's solidarity internally or impair a family's ability to function. *Id*.

Williams acted with deliberate indifference to the familial rights of the Iacopellis. As elucidated *supra*, Williams was grossly negligent in a number of particulars in her actions which adversely effected the Iacopellis. "Deliberate indifference and gross negligence are closely associated because conduct constituting gross negligence creates a rebuttable presumption of deliberate indifference." *Doe v. New York City Department of Social Services*, 649 F.2d 134 (2nd Cir. 1981); *See also, Jensen v. Conrad*, 570 F. Supp. 114 (D.S.C. 1983). Deliberate indifference may also be inferred from the failure of a governmental official to perform specific duties required under a statute. *Id*. 570 F. Supp. at 122-24.

In this case, Williams failed to follow clear DSS policy dealing with risk assessments and Safety Plans which followed the mandates of the Child Protection and Permanency Act with respect to the due process of law. Williams ignores the fact that she coerced Mrs. Iacopelli into "volunteering"[5] to submit to a Safety Plan that was contrary to DSS policy and protocols. Williams imposed unwarranted mandates on the Iacopellis which removed Mr. Iacopelli from his home and children and imposed obligations on Mrs. Iacopelli which could land her in jail if she failed to comply. And although the Safety Plan was followed by the Iacopellis, either from an altruistic sense to be law

---

[5]

     Williams forced Mrs. Iacopelli into a Hobson's choice of either consenting to the unwarranted Safety Plan or having Ms. Greene, the foster care worker take her children into immediate custody. Although somewhat more dramatic, this action is akin to Vito Corleone making a person an "offer he can't refuse." Nonetheless, to threaten a mother with removal of her children if she didn't sign the Safety Plan is unconscionable.

abiding or fear of losing their children, or even fear of being jailed, Williams never sought to monitor or enforce the Safety Plan, unbeknownst to the Iacopellis.  These actions by Williams are the very definition of deliberated indifference to the Iacopellis' rights under the Fourth, Fifth and Fourteenth Amendments which clearly protect their child-parent relationships from unnecessary, arbitrary and unwarranted state intrusion, as well as the family's privacy and security rights as a whole.

Defendant Williams argues that she did not violated Mrs. Iacopelli's fundamental familial rights to privacy and family security.  Williams abused the power under which she was acting by threatening to remove her children and by actually removing her husband .  While the Iacopelli children were not removed because Mrs. Iacopelli succumbed to Williams concocted illegal Safety Plan, her husband was removed from the family home.  Williams clearly did not understand how a DSS In-Home Safety Plan works.  Rather than naming a **"non-offending parent"** as the children's protector, Williams appointed Mrs. Iacopelli was the children's "protector," in violation of DSS policy.  Williams required Mrs. Iacopelli to enforce the terms of the Safety Plan and insure that her husband moved out of their home and that her husband could only have supervised visitation with their children.  These responsibilities a the child protector forced Mrs. Iacopelli to kick her husband out of their residence, or else Mrs. Iacopelli could be arrested.  One could not conceive of a more dastardly interference with the relationship between a husband and wife.

Williams, and DSS for that matter take the cavalier attitude and repeat the mantra of, "we didn't remove the children from the home, so what we did is okay."  Williams was plainly incompetent by failing to understand the ramifications of her illegal actions.  This is also shows Williams' conscious indifference to the Iacopellis' core rights as a family unit.  Williams was granted no power to "appoint" Mrs. Iacopelli as the children's legal guardian, that status was granted unto

38

her by God as the natural mother of her children.  What God had joined in holy unity, Williams tore

asunder,  under color of state law,  without any reasonably objective facts to justify or support her

abusive  exercise of authority.

### IV.    CONCLUSION:

WHEREFORE, based upon the facts and controlling legal principles, the Plaintiffs Joel and

Marianne Iacopelli pray that this Honorable Court deny the Defendant's motions for Summary

Judgment and Qualified Immunity.

Respectfully Submitted,


_S/ Jared Sullivan Newman_

Jared Sullivan Newman, PA
Post Office Box 515
1508 Paris Avenue
Port Royal, SC 29935
(843) 522-1313 Fax: (843) 522-0421
jnewman@jnewmanlaw.com
Attorney for Plaintiff
Fed Id No.: 5584


Port Royal, South Carolina

December 27, 2017.