**EXPERT OPINION REPORT**

**IACOPELLI v. BEAUFORT COUNTY DEPARTMENT OF SOCIAL SERVICES, AN AGENCY OF THE STATE OF SOUTH CAROLINA et.al**

**PREPARED BY MICHAEL K. COREY, MSW**

**DATE OF REPORT: 8-30-2016**

**PRELIMINARY REPORT**

## Section I. Qualifications and Related Information

My name is Michael K. Corey. I hold a Master's Degree in Social Work (MSW) from Florida State University. I am self-employed as a Consultant specializing in Child Protective Services, Foster Care and Child Welfare. I have been involved in the field of child protective services, foster care and child welfare for 45 years. I have experience at the local, state, regional and national levels. I have provided consultative services to forty-five state child protection agencies. I have been declared an expert witness in all aspects of CPS, foster care and child welfare services; including child abuse and neglect, child sexual abuse, CPS intake, CPS investigation and assessment, risk assessment, safety assessment, evaluation and planning and CPS treatment. I have further been declared as an expert in foster care, including issues relating to foster parenting, separation and loss, fostering the abused/neglected child and issues related to the removal and/or return of a child from their parent's custody and care. My experience includes direct services, supervision, administration and management, clinical services focusing on child sexual abuse and physical abuse, consultation and training services; and expert consultation and witness services.

I am co-founder and former President and Associate Director of ACTION for Child Protection, Inc. During my tenure with ACTION I was co-developer of the Child at Risk Field, the first CPS social work based risk assessment model in the country which has been utilized in whole or part by multiple CPS programs nationally. I was also a part of a group of colleagues with ACTION that developed the first child safety system in the United States. The Safety Analysis and Family Evaluation (SAFE) system has served as a prototype for child safety assessment and planning in CPS programs nationally.

I have been recognized as an expert and provided expert testimony in the aforementioned areas in juvenile and family court; criminal court and civil courts throughout the United States. I have authored or co-authored a number of publications and numerous training programs in Child Protective Services. I have provided "Expert Consultation and Witness Services" to plaintiff and defense attorney in this type of litigation. I have served in this capacity in 28 cases since 2011.

Page Two

## Section II. Consultation Request

I was contacted by Jared S. Newman, Trial Attorney, who asked if I would be willing to review materials in the matter, Iacopelli v. Beaufort County DSS et.al; and provide him with my expert opinion( and testimony, if necessary) regarding the Standard of Care of the Department of Social Services. I agreed to review materials provided and to render an opinion to him in this matter.

## Section III. Materials Reviewed

Jared S. Newman has provided the materials identified to me for my review. These materials were provided to Mr. Newman under discovery in the matter of Iacopelli v. Department of Social Services et al. I have reviewed all of the following.

1. Port Royal Police Department Incident Report
2. Hope Haven Interview Report dated 7/8/2015
3. SCDSS Intake Summary dated 7/13/2015
4. SCDSS Interviewing Guidelines Family History
5. Notice of HIPPA Privacy Practices Acknowledgment
6. Consent for the Release of Information to the SCDSS
7. SCDSS Safety Plan dated 7/13/2015
8. Request for Criminal History Record Information and/or Local Law Enforcement Records
9. SCDSS Case Determination Fact Sheet
10. SCDSS Notice of Unfounded Investigation Assessment
11. SCDSS Civil Rights Brochure
12. SCDSS Child Protective Services: A Guide for Parents
13. Child Abuse and Neglect Booklet): What Parents Should Know If They Are Investigated
14. Letters from Lowcountry Montessori School Board of Directors
15. Order Dismissing Charges
16. Bond Form
17. Legal Complaint
18. Defense Answers to Plaintiff Interrogatories et.al
19. Deposition of Latasha Williams
20. Deposition of Kyra Speller
21. Deposition of Stephanie Agatep
22. Affidavit of  Richard Brooks
23. Case Summary of Joel and Marianne Iacopelli
24. Case Dictation and Record – DSS ( Bates: SCDSS 000001 – 000075)

Page Three

25. South Carolina Department of Social Services, Human Services Policy and Procedure Manual Chapter 7.
26.  Title 63- SC Children's Code, Chapter 11, Article 3

**Section IV. Information and Findings**

**Introduction**

The South Carolina Department of Social Services (SCDSS) provides Child Protective Services (CPS) to families in need; through its forty-six county offices including the Beaufort County Department of Social Services. The components of the CPS program include but are not limited to Intake Services; Investigation and Assessment Services; Safety Assessment, Evaluation and Safety Planning services; as well as supportive services during the Investigation/Assessment and Safety Planning components.

The Standard of Care for the provision of Child Protective Services in South Carolina and states throughout the United States are state and federal laws; and in this matter the South Carolina Department of Social Services, Human Services Policy and Procedure Manual. (Chapter 7, Pages 1-223) The Policy and Procedure Manual directs staff at all levels as to the required (ministerial) activities and functions they need to carry out as they intervene into the lives of families in South Carolina.

In the matter of Iacopelli v. Beaufort County Department of Social Services et al, this report will focus on issues pertaining to:

a) CPS Intake re: The Iacopelli family
b) The CPS Investigation/Assessment Process and Protocol utilized by the SC Department of Social Services, Beaufort County Department of Social Services to include:
   1. The initial contact with the Iacopelli family
   2. The investigation/Assessment interviewing of all members of the Iacopelli family regarding the allegations made to the Department at the point of Intake.
   3. The use of the Safety Assessment, Evaluation and Safety Plan functions during the investigation assessment process of the Iacopelli family.
   4. The Standards of Care required by the South Carolina Department of Social Services and the application of those standards in the intervention of the Beaufort County Department of Social Services with the Iacopelli family.

Page Four

**CPS Intake**

1. On July 13, 2015, the Beaufort County Department of Social Services (BCDSS) received a referral regarding the Iacopelli family. The time of the report is not noted on the SCDSS Intake Summary form of the South Carolina Department of Social Services. ( Bates: SCDSS 000006-000009)
2. The report was taken by Kyra Speller, Supervisor, BCDSS. Specific allegation was TOH Sexual Abuse. The reporter stated "that the father of four children was arrested for sexually assaulting a child underneath the age of 11. The alleged victim is not his child and does not reside in his household"." Incident occurred on June 28, 2015. Alleged perp was arrested on July 10, 2015". (Bates: SCDSS000006)
3. Ms. Speller met with her supervisor, Charles Brown and they consulted on the report. They both agreed the agency needed to accept this report and assign it to an experienced worker. ( Kyra Speller deposition pages 9 and 10)
4. The Intake Summary form indicated that the report was accepted and approved; the allegation identified was Substantial Risk of Sexual Abuse and it was printed on the form: CPS Investigation/Assessment Needed. (Bates: SCDSS000006)
5. Ms. Speller noted during her deposition that she believed the Intake worker who was at lunch entered all of the information into the CAPPS automated system. (Kyra Speller deposition, page 9)
6. The SCDSS Intake Dictation form, HR1040-R01, was not contained in the material provided by the Department.

**CPS Initial Contact, Investigation/Assessment, Safety Assessment and Safety Plan and closing of the case: Practice and Protocol**

1. Latasha Williams, case manager, was assigned to conduct the Investigation/Assessment by her supervisor, Ms. Speller) on the Iacopelli family on July 13, 2015. (Deposition of Latasha Williams, page 10)
2. Ms. Williams went to the Iacopelli home and made contact with Ms. Iacopelli on the afternoon of 7/13/2015. Ms. Williams was accompanied to the home by Ms. Theresa Greene, another case manager at the Beaufort County DSS. ( Ms. Williams deposition pages 15 and 19)
3. Ms. Williams told Ms. Iacopelli the reason they came to see her and the allegations that they received regarding her husband. At the time Ms. Williams and Ms. Greene arrived

Page Five

at the Iacopelli home the children were at a next door neighbor's home. (Ms.Williams deposition pages 16 and 17).

4. Ms. Williams met with Ms. Iacopelli on the porch of her home (there were people inside of the home) and Ms. Greene interviewed the 4 Iacopelli children out by the car. ( Ms. Williams deposition page 20)

5. As noted above, Ms. Greene interviewed the 4 Iacopelli children during the initial contact at the home. According to Ms. Williams, Ms. Greene spoke with the children about the schools they attended, sports and their understanding of good touch and bad touch. ( Latasha Williams deposition, pages 10 and 26)

6. The record reflects a form titled "South Carolina Department of Social Services: Interviewing Guidelines Family History". DSS Form 3088. While there are no instructions on the form it is evident that this is a series of identifying information of family members and a series of topics for staff to cover with each family member as they are interviewing each family member. During the initial contact and investigation/assessment conducted by Ms. Williams and Ms. Greene the form reflects the following information:

   a. The names and birthdates of the Mr. Iacopelli, Ms. Iacopelli, Son███████, Daughter's ██████ and██████ and son███ It also reflects the children's schools and Mr. Iacopelli's employment.

   b. Next to ██████ it is written no touch; below his name it says everyone knows to dial 911, feel safe at home/bad, knows good and bad touch.

   c. Next to ████████ it is written no touch.

   d. Next to ██████ it is written being touched by███ in privates told mom

   e. Next to████there is nothing written.

   f. Ms. Williams acknowledged in her deposition that the handwritten notes were written by her and was information that she and Ms. Greene gathered during their contact with Ms. Iacopelli and the children.

   g. The remainder of the form includes the following sections: What is the extent of the maltreatment (which is repeated on another section)? Explanation from caregivers for the alleged maltreatment. Have you had any previous involvement with DSS? History of violence in the family. How does the family spend their spare time? How is discipline administered and by whom? Are there collaterals that can verify the family's situation? Is there any drugs and/or alcohol us by members of the family? Other related data that impact this family. Give observations of living arrangements and condition of the children. Are there significant others that have influence on this family? How long has the maltreatment been in existence?

   h. There is no written information from the contact on 7/13/2015 in item g.

Page Six

    i. Case dictation from the contact with Ms. Iacopelli is contained in the DSS record and was written according to the dictation on July 13, 2015. According to the record:

        1) Ms. Williams explained to Ms. Iacopelli the reason for being at her home and read her the allegations against Mr. Iacopelli. Please Williams asked Ms. Iacopelli if she had a response to the allegations.

        2) Ms. Iacopelli stated that all the allegations were false and there are cameras at the church that would prove the allegations were false. She also told Ms. Williams that they have cameras at their home and the video from their cameras would also prove the allegations were false because they were running late on that morning and were not at church when the incident happened.

        3) Ms. Williams states that she then interviewed the four Iacopelli children and observed their conditions.

        4) In her deposition Ms. Williams states that her colleague, Theresa Greene interviewed the Iacopelli children.

        5) The results of the interviews on July 13, 2015, were that all four children did not disclose having been inappropriately touched by anyone, with the exception that ████ says her brother had touched her inappropriately and she told her mom and her mom took care of it. All children were observed by Ms. Williams and/or Ms. Greene to be free of any marks or bruises; and each had said their relationship with their parents, Mr. and Ms. Iacopelli, were great and they felt safe in their home. ( Bates: SCDSS 000068 – 69; Ms. Williams deposition, page 26)

1. Ms. Williams completed the SCDSS Safety Plan, DSS Form 3087 on July 13, 2015. In the Safety Plan she identified the allegation of sexual abuse of an unrelated minor, by Joel Iacopelli as the danger or safety threat to the Iacopelli children. She documents in the case record that she and Ms. Iacopelli developed the Safety Plan. ( Bates: SCDSS000019-20; SCDSS000068-69)

2. Ms. Williams identified Ms. Iacopelli as the children's "protector" and further described Ms. Iacopelli's responsibility in keeping her children safe as providing a safe environment and supervising visits between Mr. Iacopelli and his children. In her deposition Ms. Williams made several comments regarding Ms. Iacopelli's abilities regarding keeping her children safe; including

    a. The agency thought it would be a good idea that we put a safety plan in place to make sure the kids are safe and I thought it was a good idea from me talking to Ms. Iacopelli that she can be a protector.

    b. I felt Ms. Iacopelli could protect the children until we can see what's further going on, because all we have is these allegations.

Page Seven

    c. I didn't think the children were at any risk or any harm and could be protected by their mother.

    d. Ms. Iacopelli appeared to be – she cared for her children
    (Bates: SCDSS000019-20; Ms. Williams deposition, pages 15, 16, 22, and 27)

1. Ms. Williams and Ms. Greene left the Iacopelli home with the signed Safety Plan.

2. Ms. Williams faxed the original Safety Plan to Mr. Newman's office on July 28, 2015; two weeks after she left the Iacopelli home ( Bates: SCDSS000066)

3. The is no case dictation in the DSS case record reviewed that documents the conversation and interaction between Ms. Iacopelli and Ms. Williams regarding the Safety Plan and its implementation. (Bates: SCDSS000001-75)

4. Ms. Williams and DSS agreed to monitor the Safety Plan as outlined. ( Bates: SCDSS000019-20)

5. There is no documentation in the DSS record that the Safety Plan was monitored by DSS at any point from July 13, 2015 – August 17, 2015; including the time period that Mr. Iacopelli was released from jail on bond. (  Bates: SCDSS000001-75)

6. Ms. Williams did not interview Ms. Iacopelli regarding the allegations that were made against her husband other than the Initial Contact with Ms. Iacopelli ( Bates: SCDSS000001-75)

7. Other than the short time Ms. Greene spend with the Iacopelli children on July 13, 2015, no case manager of DSS including Ms. Williams interviewed the Iacopelli children regarding the allegations and concerns about their father. ( Bates: SCDSS000001-75)

8. Ms. Williams did not interview Mr. Iacopelli at any time regarding the allegations made against him in the report to DSS on July 13, 2015, even when she was directed to do so at the 7 day staffing. ( Bates: SCDSS000072-73)

9. Discussions by phone on July 14th were held between and among Ms. Williams, Detective Bilyard of PRPD, Sherriff Detective Mowery, and Nicole of Hope Haven regarding law enforcement jurisdiction to make a referral to Hope Haven for the four Iacopelli children. It was finally determined that Port Royal PD needed to make the referral. ( Bates: SC000070)

10. Based upon a review of all the materials the Iacopelli children did not have forensic interviews at Hope Haven.

    a. On July 28th Ms. Williams sent an email to the offices of attorney, Jared Newman saying the children were scheduled for interviews on August 6th.

    b. Ms. Speller believed the children did have forensic interviews.

    c. There is no case dictation in the DSS files that documents forensic interviews of the children took place at Hope Haven.

Page Eight

    d. There is no documentation in the Hope Haven materials provided that forensic interviews of the Iacopelli children took place at Hope Haven.
        Bates: SCDSS 000001 – 000075; SCDSS 000067; Ms. Speller's deposition page 26)

    e. Only July 22, 2015, a 7 day staffing was held at DSS to discuss the case situation and provide direction.

        1) Positive aspects of family functioning were discussed.

        2) It was reported that mom signed the safety plan.

        3) DSS was concerned about the sexual abuse allegations

        4) On a 10 point scale regarding the children's safety both worker and supervisor rated it a 6. There was no explanation as to the rating criteria or the meaning and use of the rating.

        5) The recommendations from the staffing were to get background checks, obtain medical records and Interview Dad.

            a) Background checks were requested on July 14th and are contained in the DSS record.

            b) There are no medical records in the DSS record that was reviewed.

            c) Mr. Iacopelli was never interviewed by Ms. Williams or anyone else who worked at DSS according to the DSS record and Ms. Williams testimony during deposition. ( Bates: SCDSS 000072-73; Ms. Williams deposition page 33; SCDSS 000021-24)

1. Mr. Iacopelli was released on bond with condition that he not be around any minor children except his own children. The bond hearing the conditions were dated on July 23 and 24, 2015. The documents are in the SCDSS case record. ( Bates: SCDSS0062-63)

2. On July 29, 2015, DSS had what is referred to as a legal staffing. Staffs present were Ms. Williams, Charles Brown DSS Program Coordinator, DSS Director Lois Richter and DSS Attorney Tracy Klatt. All dictation on this case dictation has been blackened out by DSS. (Bates: SCDSS 000074)

3. On August 11, 2015, a case dictation entry by Ms. Williams states that as of August 11, 2015 the Iacopelli case was staffed with the following recommendation:

    a. Unfound case Category II classification.

    b. Enter finding and other data into automated record system

    c. Submit case decision letters

    d. There is no indication as to who was involved in the case staffing.

    e. The Case Transfer/Case Staffing form; DSS3062 was not present in the DSS record. (Bates: SCDSS 000075)

1. A SCDSS Determination Fact Sheet dated August 11, 2015 states that as of August 11, 2015 the Iacopelli case has been unfounded. It notes to see DSS Form 3065. It was

Page Nine

2. signed by Latasha Young-Williams on August 17, 2015 and by DSS Program Coordinator, Charles Brown on August 17, 2015. (SCDSS000025)
3. THE SCDSS Notice of Unfounded Investigations/Assessments form 3065 was dated August 17, 2015. It was addressed to Mr. and Ms. Iacopelli. It notified the Iacopelli's that as of August 11, 2015 there case was unfounded. Category II was checked meaning the case was unfounded because it did not produce a preponderance of evidence of abuse and/or neglect. According to Ms. Young –Williams the notification and Determination Fact sheet was put in the mail room on August 17, 2015.

## Standards of Care

The South Carolina Department of Social Services provides all staff and all local county departments with a Policy and Procedures Manual which contains actions and activities that must occur in the provision of Child Protective Services. Identified below are those Standards that relate to the matter of Iacopelli v Beaufort County Department of Social Services.

**Chapter 7, Sections 710.011, Intake Practice Issues – This section provides specific intake screening criteria and standards for decision making at Intake. It also includes a listing of Present Danger and Impending Danger Indicators which are used to determine urgency of response at Intake and at Initial Contact and Investigation and Assessment are used to determine if a child or children in the family may be unsafe. (**Pages 38-47; 49-50)

**Chapter 7, Section 719, Child Protective Services Investigation/Assessment – This section provides specific direction regarding identifying safety concerns; identifying Present and/or Impending Danger threats; identifies a process to determine if an Initial Safety Plan can be used to control safety threats; provides areas of assessment that should be used to analyze individual and family functioning; and speaks to the process and protocol of interviewing family members of the family and known collaterals. (**Pages 65-71; 73-74)

**Chapter 7, Section 719.02, Safety Planning – Safety Planning provides direction for staff on controlling Safety threats that are identified, both Present Danger and Impending Danger; mechanisms to control those threats; and the variation of types of safety plans that can be used. (**Pages 82-87)

## Analysis of Information and Findings and Implications

A. **Intake, Initial Contact and Initial Safety Plan**

Page Ten

**CPS Intake**

The Intake Report received by the Beaufort County Department of Social Services indicated a "Threat of Harm" regarding the possible sexual abuse of the Iacopelli children.

1.  The report was taken by Kyra Speller, Supervisor of Intake and Assessment Services at the Beaufort County Department of Social Services. As indicated earlier Ms. Speller and Charles Brown, Program Coordinator determined that the report met the requirements for case acceptance and approved of the report and determined that an investigation/assessment needed to take place. The report was made on July 13, 2015.

2.  The accepted intake was documented on the Intake Summary document of the South Carolina Department of Social Services. It did not include a prioritization decision as to Urgency of Response. The DSS case record did not indicate the reason the SCDSS Intake dictation form was not used for full documentation of the Intake Report.  While the information was minimal and was missing some of the requirements the decision by the Department to accept the report is judged to be within the Standard of Care for CPS Intake (SCDSS 000006-000009)

**Initial Contact and Initial Safety Plan**

1.  Latasha Williams, case manager, was assigned to conduct the investigation/assessment by her supervisor, Ms. Speller, and was accompanied to the Iacopelli home by another case manager, Theresa Greene on July 13, 2015.

2.  As noted earlier, Ms. Williams met with Ms. Iacopelli on the porch of her home (there were people inside of the home). Based upon Ms. Williams deposition it is believed that Ms. Williams and Ms. Iacopelli spoke, while at the same time Ms. Greene was speaking with the four Iacopelli children.

3.  According to the DSS dictation and Ms. Williams deposition, Ms. Williams introduced herself explained why she was there and then read Ms. Iacopelli the allegations against made against her husband, Mr. Iacopelli and asked Ms. Iacopelli if she had a response to the allegations.

4.  Ms. Iacopelli responded that these allegations were false. She also told Ms. Williams that there are cameras at the church and cameras at her home that will show that they were running late that morning and were not even at the church when the incident happened. Ms. Williams included this in her dictation.

5.  As noted earlier the four Iacopelli children were interviewed for a short time by Ms. Greene. All the children said they had not been touched inappropriately by anyone

Page Eleven

with the exception that ▮▮▮ explained that her brother, ▮▮▮, had touched her on her private and she had told her mom who had handled it. The children all stated that their relationship with their mom and dad were great and they felt safe in the home. They were also noted by Ms. Williams and Ms. Greene to be free of any marks or bruises. It is not known if the children were spoken to by Ms. Greene separate and apart from each other or if they were spoken to as a group with each child responding.

6. At some point an Initial Safety Plan was written out by Ms. Williams. In her case dictation Ms. Williams notes that she and Ms. Iacopelli developed the Safety Plan together. It should be noted that the SCDSS Safety Plan is a pre-printed form ( DSS form 3087) that has blanks all through it so the case manager, Ms. Williams in this instance, can fill out the appropriate areas. The Safety Plan that was put in place with the following specific information.

   a. Item: Description of the reported harm or safety threat to the children. Describe specific behaviors that cause the children to be unsafe: Information filled in by Ms. Williams: "Father, Joel Iacopelli allegedly licked an underage female on the vagina". ( Please note the referenced allegation involved an underage child who is not a family member and does not live with the family)

   b. "Children are not aware of father being incarcerated for sexual abuse allegations".

   c. Item: Actions that will protect the child during the investigation: "to protect children and keep safe. The protector is identified as "Mary Ann Iacopelli" ( Please note the correct spelling of Ms. Iacopelli's first name is Marianne)

   d. Item 1. "to keep children safe in a healthy environment" Item 2: "to supervise visits between father (Joe Iacopelli) and children until investigation is completed".

   e. In other section it states that if the alleged perpetrator leaves the home during the investigation what visitation is allowed: It is written in by Ms. Williams: supervised visits at mothers will monitored by Mary Ann (Marianne) Iacopelli.

   f. There is a place on the pre-printed form to note if a parent refuses to sign the form. In this matter Ms. Iacopelli signed the form; however there is a pre-printed warning for a parent who refuses to sign the form. "If the parent(s) refuse to sign a valid safety plan, an out-of-home placement must be sought by Law Enforcement or Ex-parte Order to keep the child safe, pending the completion of this investigation.

Page Twelve

g. On the form where Ms. Iacopelli signed the Safety Plan there is a paragraph that begins " DSS agrees to complete the investigation in the time as indicated above…" There is two dates on the form, one is July 13, 2015 which is the date of the initial contact and Safety Plan; the other date is October 13, 2015 which is the expected ending date of the Safety Plan. The dates are not for an investigation.

h. Lastly, as it relates to the Safety Planning form: There is a pre-printed paragraph at the bottom of the 2nd page of the form that says "These services represent an effort by the DSS to assist this family to strengthen its capacity to protect, guide and nurture this child within the family home or with a protective caregiver who is going to provide care for the child during the investigation. Should these services prove ineffective and it is no longer possible for this child to remain safely within the family home, out-of-home care is the planned arrangement for this child". There is a yes and no box following. In this matter the box is checked Yes.

i. At the end of the initial contact, Ms. Williams and Ms. Greene left the Iacopelli home with the original Safety Plan.

There are a number of issues in the conducting of the Initial Contact and the development of the Initial Safety Plan re: the Iacopelli family that are troubling.

1. After Ms. Williams read Ms. Iacopelli the allegations made against her husband, Mr. Iacopelli, she asked if Ms. Iacopelli had a response to the allegations. Ms. Iacopelli provided the response that Ms. Williams documented in the case dictation and is noted above in item #4. There is no further documentation in the case dictation regarding any discussion that was had between Ms. Iacopelli and Ms. Williams on this matter. Further there is no documentation in the record regarding Ms. Williams' discussion with her supervisor or other supervisory/management staff regarding Ms. Iacopelli believing the allegations to be false and the rationale for that belief. Even more so, there is no documentation in the DSS record by Ms. Williams that she followed up on Ms. Iacopelli's claims either with persons at the church or detectives investigating the alleged criminal charges against Mr. Iacopelli. Finally, in the 7 day staffing held between Ms. Williams and Ms. Speller the only mention of Ms. Iacopelli's belief is "mom doesn't believe the allegations". . The absence of any follow-up as the case proceeded over the next month is very concerning. The fact that no Page Thirteen

further discussion occurred during the Initial Contact and the subsequent development of the Initial Safety Plan is inexplicable.

2. Prior to the development of the Initial Safety Plan: Ms. Williams and Beaufort County DSS had allegations that Mr. Iacopelli may have been sexual with a young child. The reason for accepting the intake report was because Mr. Iacopelli had minor children there might be a Threat of Harm (TOH) of sexual abuse towards his children. Ms. Greene spoke with the Iacopelli children and was told by all four of the children that no one had touched them in an inappropriate sexual manner. Ms. Williams has expressed her belief multiple times during her testimony in deposition and in the 7 day staffing that she believed Ms. Iacopelli:
   a. Was able to care for her children
   b. I felt Ms. Iacopelli could protect the children until we can see what's further going on, because all we have is these allegations.
   c. I didn't think the children were at any risk or any harm and could be protected by their mother
   d. None of the children reported that they have been touched inappropriately; children live in a suitable environment; children appear to be taken care of; mom has good caretaker capacity.

1. In order to consider the need for a Safety Plan certain criteria need to be present.
   a. The case manager needs to identify a Present or Impending Danger threat that places the child or children in danger.
   b. The case manager has to determine that a Safety Plan can control the effects of the Present or Impending Danger threats identified; and
   c. The case manager has to determine that the parent/caregiver's Protective Capacities are insufficient to control the danger threats that have been identified. ( SCDSS Policy Manual pages 24, 45-47 and 83-84)

1. As noted earlier, Ms. Williams believed that Ms. Iacopelli possessed Protective Capacities. She believed that Ms. Iacopelli could protect her children. The allegation of Mr. Iacopelli being sexual with an unrelated child is not a Present and/or an Impending Danger threat; nor is the actual allegation that caused the Department, Ms. Williams and Ms. Greene to go to the Iacopelli home. The actual allegation was (TOH) of sexual abuse. Ms. Greene and Ms. Williams learned that all the Iacopelli children said that no one had touched them in a sexually inappropriate manner.  One of the real questions in this case is why was a Safety Plan put in place? Perhaps the answer is what Ms. Williams testified in Page Fourteen

her deposition. "So the agency thought it would be a good idea that we put a safety plan in place to make sure that the kids are safe, and I thought it was a good idea from me talking with Ms. Iacopelli that she can be a protector." The reason the issue of why was a safety plan put in place is the Beaufort County Department of Social Services; Ms. Williams, case manager; Ms. Speller, supervisor; Charles Brown, Program Coordinator did not learn one more thing about the family and its individual members from the late afternoon of July 13, 2015 forward until the case was officially closed in mid- August, 2015. Ms. Williams and DSS never even went to the home to monitor the Safety Plan as the SCDSS Safety Plan said they would. The point is what was known by DSS and all of the staff involved on July 13, 2015 is the extent of knowledge throughout the remainder of the time the Iacopelli family's case was active with the Department. No staff member of Beaufort County DSS made any further contact with the members of the Iacopelli family. How can anyone justify a Safety Plan being put in place on July 13, 2015?

2. The Beaufort County Department of Social Services contends that the signature of the parent on the SCDSS Safety Plan is a voluntary agreement. How can it be a voluntary agreement between the parent and DSS when directly below where the parent and the DSS employee signs the form it says: "If the parent(s) refuse to sign a valid safety plan, an out-of-home placement must be sought by Law Enforcement or Ex parte Order to keep the child safe, pending the completion of the investigation. ( SCDSS Safety Plan Form 3087, Ms. Speller's deposition page 34)

It is my considered opinion based upon my knowledge and experience that the Initial Contact and Initial Safety Plan conducted and developed by the Beaufort County Department of Social Services, South Carolina Department of Social Services and Ms. Latasha Williams, Case Manager, Beaufort County Department of Social Services falls significantly below the Standard of Care of the South Carolina Department of Social Services requirement.

A. **CPS Investigation and Assessment, Case Determination and Case Closure**
1. The CPS Investigation/ Assessment regarding the Iacopelli family began with the Initial Contact referred to above on July 13, 2015 and continued until August 17, 2015 when Ms. Williams and Mr. Charles Brown signed the SCDSS Determination Fact Sheet form 3070 regarding the Iacopelli family. (SCDSS 000001-000075)

Page Fifteen

2. During the time Ms. Williams was assigned the Iacopelli family to carry out the responsibilities of an Investigation/Assessment, Ms. Williams never met with, never contacted, never interviewed Mr. Iacopelli either regarding the allegations that brought the DSS into the Iacopelli family's life; or regarding the type of information that a case manager is responsible for gathering under the policy of the Department of Social Services. ( SCDSS Policy Manual pages 69-70; SCDSS 000001-000075)

3. Ms. Williams never followed up on the recommendation from her supervisor, Ms. Speller to interview Mr. Iacopelli on July 22, 2013. ( SC 000072)

4. Ms. Williams never met with Ms. Iacopelli or the 4 Iacopelli children after the initial contact on July 13, 2013. ( SCDSS 000001-000075 deposition of Ms. Williams)

5. Ms. Williams never monitored the Safety Plan she had put in place on July 13, 2015 with the Iacopelli family. (SCDSS 00001-000075)

6. The SCDSS Determination Fact Sheet dated August 11, 2015 states the Iacopelli case has been unfounded. It was signed by Latasha Young-Williams on August 17, 2015; as well as Program Coordinator, Charles Brown.

7. The Notification of Unfounded Investigation/Assessment form 3065 was dated August 11, 2015. There are questions and confusion whether the notification and determination forms were sent and/or received by the Iacopelli family. One thing is certain based upon all documentation reviewed.  The policy of the SCDSS was not followed regarding notification.  The South Carolina Department of Social Services Policy Manual states: "The appropriate notice letter shall be completed after the face to face discussion with the family". As has been noted throughout regarding the absence of contacts by DSS or Ms. Williams with the Iacopelli family; the required face to face did not occur. (SCDSS Policy Manual page 78)

8. When the Beaufort County DSS closed the case regarding the Iacopelli family they were required to identify the category associated with its decision to unfound the allegations and the case. Beaufort County DSS selected Category II-The Investigation Assessment did not produce a preponderance of evidence that the child was abused or neglected. The proper categorization in my opinion should have been Category 1 – Abuse and Neglect was ruled out by the Investigation Assessment. This difference is more than semantical. Beaufort County DSS, Ms. Williams and Mr. Brown did not have any information that added up to any finding of preponderance. The only information Beaufort County DSS had at the end of its Investigation Assessment was the same it had at the beginning; an allegation of TOH regarding sexual abuse.

It is my considered opinion based upon my knowledge and experience that the South Carolina Department of Social Services, Beaufort County DSS and case

Page Sixteen

manager, Latasha Williams and the supervisory/management staff of Beaufort
County DSS did not carry out an investigation/assessment into the report of Threat
of Harm re: Sexual Abuse of the Iacopelli children. Ms. Williams did not interview
the members of the Iacopelli family regarding the areas of functioning specified by
the South Carolina Department of Social Services (page 69-70 South Carolina Policy
manual); Ms. Williams did not monitor the Safety Plan as policy, procedure and
practice require; Ms. Williams did not notify the family of the Case Decision as
required by Policy, Procedure and Practice. The actions of the Beaufort County
Department of Social Services, Ms. Williams and supervisory/management staff fall
woefully below the Standard of Care in the conducting of investigations in Child
Protective Services.

**Standard of Care Opinion**

I have reviewed all of the materials identified in this report. I have analyzed the
available information from a perspective of Child Protective Services standards,
nationally acceptable standards of case practice and the Standards of Care of the
State of South Carolina.

It is my considered opinion based upon my knowledge and experience that the work
carried out in the matter of Iacopelli v Beaufort County DSS et al falls significantly
below the Standard of Care required of the South Carolina Department of Social
Services and the Beaufort County Department of Social Services. DSS in a very real
way, intervened into the Iacopelli family's life; restricted the inherent freedoms of
this family (through an ill - conceived Safety Plan); and basically abdicated all of
DSS's responsibility to the family and in a practical manner forgot about the Iacopelli
family.

If I am provided with additional materials and asked to review those materials, I
reserve the right to do so; and to report as to whether the new materials reviewed
changes or modify the opinions I have rendered.

Respectfully Submitted


Michael K. Corey, MSW
Consultant