IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Joel Iacopelli, | ) | Civil Action No. 9:16-0287-PMD-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Town of Port Royal, Robert Bilyard, John | ) | |
| Griffith, Beaufort County Department of | ) | |
| Social Services, and Latasha Williams, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| Marianne Iacopelli, | ) | Civil Action No. 9:16-0288-PMD-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Town of Port Royal, Robert Bilyard, | ) | |
| Beaufort County Department of Social | ) | |
| Services, and Latasha Williams, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

These cases were originally filed by the Plaintiffs in the South Carolina Court of Common Pleas, Beaufort County. Both cases were then removed to this United States District Court by the Defendants on January 29, 2016, as the Complaints in both cases contain federal causes of action as well as state causes of action. See 28 U.S.C. § § 1441, 1443 and 1446. By Order filed January 6, 2017, the cases were consolidated for pre-trial and discovery purposes.



1

One of the originally named Defendants, Kyra Speller, was dismissed as a party Defendant by Order filed August 7, 2017. Another originally named Defendant, Hope Haven of The Low Country, Inc., was dismissed as a party Defendant by Order filed October 24, 2017.[1] The Defendant Town of Port Royal thereafter filed a motion for summary judgment in both cases on November 13, 2017. The Defendant John Griffith (who is only named as a Defendant in case No. 9:16-287)[2] also filed a motion for summary judgment on that same date. The Defendant Robert Bilyard filed a motion for summary judgment in case No. 9:16-287 on November 13, 2017, and in case No. 9:16-288 on November 29, 2017. The remaining Defendants Beaufort County Department of Social Services and Latasha Williams then filed motions for summary judgment in both cases on December 8, 2017.

Responses in opposition as well as reply memoranda have now been filed by the parties to all of these pending motions, which are now before the Court for disposition.[3] As the facts and evidence relating to both cases are the same, Defendants' motions have been addressed together in this one Report and Recommendation, which the Clerk is to file in both cases.

### General Background

These cases arise out of the arrest of the Defendant Joel Iacopelli (hereinafter "Joel") on July 10, 2015 on the charge of criminal sexual conduct first degree with a minor under eleven

---

[1]Hope Haven was only named as a party Defendant in Case No. 9:16-287.

[2]Plaintiff Joel Iacopelli amended his Complaint on August 18, 2016 to add John Griffith as a party Defendant in his case.

[3]These cases were automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), D.S.C. The Defendants have all filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.



years of age.  Plaintiff Marianne Iacopelli (hereinafter "Marianne") is Joel's wife.  Joel and Marianne are the parents of four children, ranging in age in 2015 from twelve to five years old.

Joel was a Sunday school teacher at the Community Bible Church.  On June 29, 2015, the Port Royal Police Department received a report of possible sexual abuse of a minor that had occurred at the church the day before.  The mother of the child reported that at 9:00 a.m. Sunday morning she had left her child with a white male teacher with a shock of blond hair on dark hair, and a black female teacher.  After the mother picked up her child later that day, she reported that the child had told her she had been sexually abused.  The child later allegedly repeated this same story to her father, although she then also reportedly told her father that she was making it all up.  Even so, the mother took her child to the pediatrician the following day, where she was advised that they were required to report allegations of sexual abuse to law enforcement.  The mother thereafter filed a report, following which the clothing the girl was wearing the day before was collected from the laundry and placed into evidence.

On July 2, 2015, the church's security expert, Rick Forschner, provided the security video from the church to the police.  Joel was also identified by church staff as being the only male teacher in the classroom on the day in question.  Joel was then contacted by Detective John Hogue on July 7, 2015, and Joel indicated he would come in the following day to discuss the incident with him.  The next day, a forensic interview of the victim was performed by Kendra Twitty, a forensic interviewer and therapist, although the parties dispute what, if any, conclusions she may have reached.[4]  Also on July 8, 2015, Joel was interviewed at the Port Royal Police Department.  Joel told

---

[4]The Defendants contend that Twitty informed Hogue that the child had made a "clear disclosure of abuse", while in her deposition Twitty denied ever reaching this conclusion.



the police that although the child's mother said she had handed off her child to him and a black female at or around 9:00 a.m., that he had not arrived at the church that morning until 11:15 a.m. Church officials also separately confirmed that Joel did not arrive that day until around 11:00 a.m. While Joel was present as a teacher in the child's class that day (the mother did not return to retrieve the child until after church services had ended, around 1:00 p.m.), he denied touching any of the children and agreed to provide a buccal swab for DNA evidence. Joel also initially agreed to take a polygraph examination, which was to be performed at 1:00 p.m. on July 13, 2015. However, Joel stated that he had a doctor's appointment at that time, but agreed to try to reschedule his appointment. Although Defendant Robert Bilyard (a police detective) testified that a polygraph was in the works, Plaintiff was arrested prior to when it was scheduled, and no polygraph examination was ever administered.

On July 9, 2015, Detective Hogue went to the church to speak with security expert Forschner and Evelyn Owens (head of the children's area), but when he arrived Pastor Broggi advised him that the church had retained legal counsel and that any further communication would have to go through the attorney. Later that afternoon, the child's parents had a followup interview with Hogue and the Defendant John Griffith (a police captain), during which the mother again stated that she had dropped her child off with Joel. The parents were advised that additional interviews were going to be conducted, that the church video would have to analyzed, and the police were also awaiting DNA results from the child's clothing. Later that day Detective Hogue was relieved from any further work on the case by command staff, and the case was reassigned to the Defendant Bilyard (Chief Detective).

The following day, July 10, 2015, Solicitor Mary Concannon (now Mary Jones) spoke



4

to Twitty, Hogue and Bilyard about the status of the investigation. The parties dispute exactly what was said during Jones' conversation with Bilyard and exactly how much information Jones was provided about the evidence and what that evidence was, but the result of the conversation was that Jones advised Bilyard she believed there was probable cause for an arrest. The parties also dispute whether Jones instructed Bilyard to forward a report to DSS so they could conduct their own investigation since there were four minor children in the Iacopelli home, but it is undisputed that Bilyard did forward a report to DSS following his conversation with Jones. This resulted in Bilyard receiving a call from the Defendant Latasha Williams (with DSS), who advised that she and another DSS officer would be going to the Iacopelli home to speak with Marianne. Further, after Bilyard told Griffith (his immediate supervisor) of his conversation with Jones, Bilyard contends that he was instructed by Griffith to arrest Joel, although Griffith contends that he simply told Bilyard to go forward with the case if he was confident in doing so.

Bilyard then submitted an affidavit with a proposed warrant to County Magistrate Judge Richard Brooks which read as follows:

> ON 06/28/2015 AT 638 PARRIS ISLAND GATEWAY, COMMUNITY BIBLE CHURCH LOCATED IN THE TOWN OF PORT ROYAL, THE DEFENDANT, JOEL PETER IACOPELLI DID VIOLATE SC STATE LAW 16-3-655(A)-(1) CRIMINAL SEXUAL CONDUCT WITH A MINOR, UNDER 11 YRS OF AGE. THE DEFENDANT WHILE VOLUNTEERING IN THE FOUR YEAR OLD CLASSROOM AT THE CHURCH, DID COMMIT THE ACT OF CRIMINAL SEXUAL CONDUCT ON A 4 YR OLD JUVENILE BY HOLDING HER DOWN, MOVING ASIDE THE VICTIMS PANTIES AND LICKED HER VAGINA. THIS WAS REVEALED DURING A FORENSIC INTERVIEW OF THE VICTIM. AFFIANTS INVESTIGATION AND WITNESSES WILL PROVE THE SAME.

See Court Docket No. 88-4 [Errors in Original].

Judge Brooks signed the arrest warrant, as well as search warrants for computers and surveillance



video from the Iacopelli home.[5]  Joel was thereafter arrested at his home on Friday, July 10, 2015,

and transported to the Beaufort County Detention Center.  The search warrants were also executed

at the Iacopelli home, and an iPad, an iPhone, a Defender Security Server, LeNovo laptop, and a

MacBook Pro were seized.  That same day, July 10,2015, the child's mother dropped off a six page

typed statement at the police department, and the church provided some records that had previously

been requested, to include the names of the teachers in the classes, the attendance records for the

classes, and applications for the childrens' ministry workers.  These records were later revised by the

church on July 15, 2015.[6]

    The following morning, a bond hearing was scheduled before Beaufort City Municipal

Judge Ned Tupper (who was temporarily filling in for the Port Royal Municipal Judge, who was on

vacation), who declined to hear the matter due to the nature of the charges, and stated that bond

would need to be set by the Court of General Sessions.  While Joel remained in custody, a monitored

conversation occurred between Joel and Marianne in which Joel indicated that there were two more

computers in his car that he did not want the police department to have, and for Marianne to take

those computers into the house.  As a result of that conversation, Bilyard obtained another search

warrant on July 16, 2015.[7]  In the interim, a General Sessions bond hearing had been scheduled for

---

[5]Joel had earlier told police detectives that he had home video from his house that would confirm he was not at the church at 9:00 a.m. on the day of the incident.

[6]The attendance records produced were only for the 11:00 a.m. class (showing only four children total present in that class), but no records for the 9:00 a.m. class were initially produced.

[7]Although the search warrant application references Joel telling Marianne that he did not want the police to get these computers, when asked in his deposition whether he saw anything sinister or criminal in Plaintiff asking his wife to take the computers from the car into the house, Bilyard testified that it could go both ways, and that he was just doing what he was told.  See Bilyard
(continued...)



July 13, 2015, but a bond determination was deferred at that time at the request of the Solicitor on behalf of the alleged victim's family, who were out of town. A second bond hearing was scheduled for July 23, 2015, at which time State Circuit Judge Thomas Cooper set bond at $75,000. Joel posted ten percent and was released the following day.

Prior to Joel's release, the new search warrant was executed at the Iacopelli home. Marianne initially told Bilyard that she did not have the computers Joel had discussed and did not know where they were. After further questioning, however, Marianne turned over a Tablet to the officers, but told them that Joel's work computer had already been picked up by a carrier. Marianne did not mention any other computers. However, officers determined that Joel's work computer had not been picked up, and after further questioning, Marianne then admitted to police officers that she had taken the computers to Jared Newman's office.[8] When Newman was contacted, he told the officers they would need a search warrant. After Bilyard obtained a warrant for Newman's office, Hogue met with Newman at his office and an Elitebook, a Toshiba, a Dell Inspirion, and a MacBook were seized. Although searches of these computers were supposed to have been made, the only files that were ever provided to the Port Royal Police Department were from the iPhone, which was subsequently returned to Joel on August 27, 2015.

Also, on July 13, 2015, Williams and a DSS foster care worker, Theresa Greene, had gone to the Iacopelli residence unannounced to interview the Iacopelli's minor children. Marianne

---

[7](...continued)
Deposition [Court Docket No. 98-3], p. 8; see also Exhibit [Court Docket No. 99-19], p. 3. All court Docket Nos. cited herein are from 9:16-287 unless otherwise indicated. Deposition excerpts from the same depositions are also scattered throughout the parties' filings, so the Court Docket numbers have also been used when citing to deposition testimony for ease in locating specific pages.

[8]Jared Newman is Plaintiff's attorney in this action.



was presented with a "safety plan", part of which was that Joel was not to have any unsupervised

contact with the children.  Marianne says she was told that if she failed to consent to the safety plan,

her children would be immediately removed from the home, and indeed the DSS safety plan form

specifically provides that if the parents refused to sign the safety plan, an out of home placement for

the minor children must be sought pending completion of the investigation.  Marianne was further

advised by Williams that if Joel was found to be at the house with the children, even if Marianne was

also there, that they would both be arrested and their children would be taken to foster care.  Williams

also requested a criminal background check on Joel, which she received on July 15, 2015 and which

showed that Joel had no criminal record.

On August 1, 2015, Marianne took the children to Disney World.  Joel was not

allowed to accompany his family on this trip.  Although forensic interviews of the Iacopelli children

had been scheduled for August 6, 2015, Marianne did not take her kids for the forensic interviews

on that date.  Marianne testified that no one had ever told her about these interviews; however, Joel

testified that he and Marianne both knew about the forensic interviews, but that their lawyer had told

them not to take the children for these interviews.  In any event, on August 11, 2015, Williams and

Charles Brown (also with Beaufort DSS) met about the case and determined that there was not a

preponderance of the evidence that any of the Iacopelli children had been abused or neglected, and

Williams testified that on August 17, 2015 she mailed a notice of unfounded investigations and fact

sheet to the Iacopellis.  However, the Iacopellis never received this letter.  Even so, on August 15,

2015, Joel had moved back in with the family.  Joel testified that after several attempts by his lawyer

to contact the "DSS people," they finally got the answer that he could potentially go home.

On August 14, 2015, a preliminary hearing was held before Judge Brooks, following



8

which Brooks issued an order on August 20, 2015 dismissing the charges for lack of probable cause. Thereafter, initial DNA results were returned from the Beaufort County lab on October 7, 2015 concluding that no DNA had been found on the child's clothing that matched Joel. On December 10, 2015, the Solicitor's Office advised the Port Royal police that they could release the computers back to the Iacopellis, following which the computers and devices were returned to the Iacopellis on December 16, 2015, with nothing of evidentiary value having been found.

### Federal Causes of Action

Both Plaintiffs assert several causes of action in their Complaints pursuant to 42 U.S.C. § 1983 alleging violations of their constitutional rights.[9]  Specifically, Plaintiff Joel asserts a cause of action against the Defendant Bilyard for violations of his Fourth Amendment right to be free from unreasonable seizure and incarceration, while both Plaintiffs assert claims against Bilyard for unreasonable searches and seizures of Plaintiffs' property, for unlawfully depriving Plaintiffs of their property, and for unreasonably invading the Plaintiffs' privacy and disrupting their family life. Joel also asserts these same claims against the Defendant Griffith based on his alleged ordering of his subordinate (Bilyard) to obtain the "facially invalid" arrest warrant and search warrants and for failing to conduct a reasonable investigation, which led to Joel's "unlawful" seizure.

Joel also asserts a federal claim against the Town of Port Royal relating to his court proceedings, alleging that Port Royal violated his constitutional rights by "adopting a policy, custom,

---

[9] 42 U.S.C. § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  A civil action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999).  Both Plaintiffs also reference 42 U.S.C. § 1988, which provides that attorneys fees may be awarded in cases brought under § 1983.



practice or procedure that denies citizens . . . their due process rights to have a [bail] hearing" . . . .
Finally, both Plaintiffs assert a claim against the Defendant Williams, alleging that Williams deprived
them of their constitutional rights by "unreasonably invading [their] federally protected interest in
[their] family, home and hearth", by violating their due process rights, and by "imposing restrictive
conditions on [their] family relationships . . .".

 The undersigned hereinbelow addresses each of these claims, in turn.

 **Joel's federal claim against the Town of Port Royal**.  In his Eleventh Cause of
Action Joel asserts a federal constitutional claim against the Town of Port Royal pursuant to § 1983.
Specifically, Joel alleges that the Town of Port Royal violated his constitutional rights by adopting
a policy, custom, practice, or procedure that denies citizens (such as Joel) their due process rights to
a bail hearing and by continuing to imprison him in violation of his due process rights as a result of
his failure to obtain bail or have a hearing on the issue of bail.  <u>See</u> <u>Amended Complaint</u>, (Case No.
9:16-287), ¶ 100 [Court Docket No. 40].  Port Royal contends that it is entitled to summary judgment
on this claim because Joel's claim arises solely from actions taken by the Municipal Judge and the
Solicitor with respect to his court proceedings, for which it is not responsible and cannot be held
liable.  The undersigned agrees.

 The Town of Port Royal may be held liable under § 1983 only if "the action that is
alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or
decision officially adopted and promulgated by that body's officers."  <u>Monell</u>, 436 U.S. at 690-691;
<u>see also</u> <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163,
166 (1993) ["[A] municipality can be sued under § 1983, but it cannot be held liable unless a
municipal policy or custom caused the constitutional injury"]; <u>Milligan v. City of Newport News</u>, 743



F.2d 227, 229 (4th Cir. 1984) [A municipality may be liable under § 1983 for the violation of a Plaintiff's constitutional rights "only where the constitutionally offensive actions of employees are taken in furtherance of some municipal 'policy or custom'"]; Spell v. McDaniel, 824 F.2d 1380 (4th Cir. 1987), cert. denied, 484 U.S. 1027 (1988). Port Royal cannot be held responsible for the legal rulings of the presiding judge at his initial bail hearing just because the judge was a municipal judge.[10] Monell v. Dep't of Social Servs., 436 U.S. 658, 690-691 (1978) [Governmental entity cannot be held liable under § 1983 merely because it employs an alleged tortfeasor].

As for the municipal judge himself (as well as the state circuit judge who subsequently postponed Joel's bail hearing), even if Joel had named them as party Defendants, judges are entitled to absolute judicial immunity from suits for money damages for all actions taken in the judge's judicial capacity. Bush v. Rauch, 38 F.3d 842, 847 (6th Cir. 1994); see Mireles v. Waco, 502 U.S. 9 (1991); Stump v. Sparkman, 435 U.S. 349, 351-64 (1978); Pressly v. Gregory, 831 F.2d 514, 517 (4th Cir. 1987); Chu v. Griffith, 771 F.2d 79, 81 (4th Cir. 1985)["It has long been settled that a judge is absolutely immune from a claim for damages arising out of his judicial actions."]; see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) [absolute immunity "is an immunity from suit rather than a mere defense to liability"]. Further, to the extent any employees of the Town of Port Royal were involved in these proceedings, "[p]ersons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer" are also immune from suit for money damages under the doctrine known as quasi-judicial immunity. Bush, 38 F.3d at 847; see also Scruggs v. Moellering, 870 F.2d 376 (7th Cir.), cert. denied, 493 U.S. 956 (1989); cf. Ingram v.

---

[10]As is shown in the evidence, the judge who held the initial bond hearing was not even the Port Royal Municipal Judge. Rather, it was the Beaufort City Municipal Judge, who was filling in because the Port Royal Municipal Judge was on vacation.



<u>Township of Deptford</u>, 858 F.Supp.2d 386, 390-391 (D.N.J. 2002)["Judicial immunity may extend to professionals who assist courts in their judicial function . . . . [and] the Supreme Court has long held that a judge's exercise of control over the courtroom . . . is a judicial act."].

Nor is the Town of Port Royal responsible for the actions or conduct of the Solicitor during his bail proceedings. The Solicitor is a state officer, not a municipal employee. <u>See</u> S.C.Code Ann. § 1-7-325 [Solicitors are employees of the State of South Carolina]. Moreover, even if the Solicitor had been named a party Defendant, she also enjoys immunity from suit under § 1983, as prosecutors have absolute immunity for activities in or connected with judicial proceedings, such as a criminal trial, bond hearings, bail hearings, grand jury proceedings, and pre-trial "motions" hearings. <u>See generally</u>, <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 272-73 (1993); <u>Burns v. Reed</u>, 500 U.S. 478 (1991); <u>Dababnah v. Keller-Burnside</u>, 208 F.3d 467 (4th Cir. 2000).

Indeed, in his response memorandum, Joel concedes that he does not have a claim against the Town of Port Royal with respect to his having been denied bail or a bail hearing, and agrees to withdraw that claim. Instead, Joel argues in his response brief that he wants to pursue a claim against Port Royal for a violation of his constitutional rights for an unreasonable arrest. However, Port Royal argues in its reply brief, and the undersigned agrees, that Joel made no such federal claim in either his original Complaint or in his Amended Complaint, and it is too late for him to do so now.[11] This case has been pending for over two years, discovery has been completed, and all of Plaintiffs' claims have been fully briefed for summary judgment. It is simply too late for Joel to amend his Complaint at this time to assert a new claim. <u>Cf</u>. <u>Deasy v. Hill</u>, 833 F.2d 38, 42 (4th Cir.

_____

[11]Joel has, however, <u>also</u> asserted causes of action against the Town of Port Royal for malicious prosecution as well as for gross negligence relating to his arrest, state law tort claims which are addressed separately. <u>See</u>, discussion, <u>infra</u>.

12



1987); Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 604 (4th Cir. 2010). Moreover, Joel

has not filed a motion to amend to add this claim.

Therefore, the Defendant Town of Port Royal is entitled to summary judgment with

respect to Joel's federal claim asserted in his Eleventh Cause of Action.

**Unreasonable Seizure and Incarceration**. Joel's claims of unreasonable seizure and

incarceration against Bilyard and Griffith[12] arise out of his arrest. "To prevail on a false arrest claim,[13]

a plaintiff must establish that his arrest was not lawful". Martin v. Lott, No. 07-3782, 2010 WL

597209, at * 2 (D.S.C. Feb. 16, 2010). To establish that his arrest and seizure were not lawful, Joel

must show that his arrest was without probable cause. Wortman v. Spartanburg, 425 S.E. 2d 18, 20

(S.C. 1992) ["The fundamental question in determining whether an arrest is lawful is whether there

was 'probable cause' to make the arrest"]. "The Fourth Amendment prohibits law enforcement

officers from making unreasonable seizures, and seizure of an individual effected without probable

---

[12]Only Joel asserts a separate claim against Griffith.

[13]As pled and set forth in his pleadings, Joel's federal claim against Bilyard and Griffith is one for false arrest, not for malicious prosecution, which would be a totally separate claim. The continuation of the prosecution of charges against a claimant following an arrest and arraignment is what distinguishes a claim of malicious prosecution from one for false arrest or imprisonment. See Wallace v. Kato, 549 U.S. 389 (2007) ["Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process - when, for example, he is bound over by a Magistrate or arraigned on charges . . . Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process."] (internal citations omitted)[Emphasis in original]; see also Panzica v. Corrections Corp. of America, 559 Fed.Appx. 461, 464-465 (6th Cir. Mar. 17, 2014)[Distinguishing between malicious prosecution and false imprisonment]; Singer v Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995) (quoting Prosser and Keeton on Law of Torts § 119, pp. 885-886 (5th ed. 1984)["If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim . . . ."]).



cause is unreasonable". <u>Brooks v. City of Winston-Salem, N.C.</u>, 85 F.3d 178, 183 (4th Cir. 1996).

In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer(s) at the time of the arrest, and "[t]o prove an absence of probable cause, [a plaintiff] must allege a set of facts which made it unjustifiable for a reasonable officer to conclude that [he] was violating [the law]". <u>Brown v. Gilmore</u>, 278 F.3d 362, 368 (4th Cir. 2002). "Whether there is probable cause to justify an arrest turns on the facts and circumstances known to the officer at the time of the arrest, <u>Michigan v. DeFillipo</u>, 443 U.S. 31, 37 (1979), and whether those known facts give rise to a fair probability that the suspect has committed a crime, <u>Florida v. Harris</u>, 133 S.Ct. 1050, 1055 (2013) (defining probable cause)". <u>Robinson v. City of South Charleston</u>, 662 Fed.Appx. 216, 220 (4th Cir. 2016)(internal quotations omitted). Therefore, since probable cause is measured objectively, not subjectively, how Griffith or Bilyard may have subjectively interpreted the evidence is not a "material fact" for purposes of granting or denying summary judgment. Rather, the question is whether the facts within the knowledge of the arresting officers provide a probability on which a "reasonable and prudent person" would have concluded that Joel had engaged in criminal activity. <u>Robinson</u>, 662 Fed.Appx. at 220; <u>see</u> <u>also</u> <u>United States v. Gray</u>, 137 F.3d 765, 769.

Moreover, "if the question is sufficiently close that an objectively reasonable officer could conclude that probable cause existed, then the individual defendants are entitled to qualified immunity."[14] <u>Robinson</u>, 662 Fed.Appx. At 220 (citing <u>Rodgers v. Pendleton</u>, 249 F.3d 279, 290 (4th

---

[14]Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." <u>Meyers v. Baltimore Cty.</u>, 713 F.3d 723, 731 (4th Cir. 2013) (citing <u>Harlow v. Fitzerald</u>, 457 U.S. 800, 818 (1982)). This protection "'balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties
(continued...)



Cir. 2001)). Finally, although Joel contests the validity of the arrest warrant issued by the judge in his case, any defects in the arrest warrant (assuming any were to be found) would not necessarily substantiate Joel's claim, as "probable cause is sufficient to justify a public arrest under the Fourth Amendment regardless of the validity of the arrest warrants obtained by the officers or any deficiencies in the affidavits supporting them." Robinson,662 Fed.Appx. 220 (citing Graves v. Mahoning Cty., 821 F.3d 772, 774-776 (6th Cir. 2016)). See also Palmer v. Santana, No. 16-3350, 2018 WL 1477600, at * 2-4 (D.S.C. Mar. 27, 2018).

Turning then to consideration of whether the evidence is sufficient to create a genuine issue of fact as to whether a "reasonable and prudent" person would have believed Joel had committed a crime,[15] the evidence shows that on June 29, 2015 the Port Royal Police Department received a report from a mother that her child had stated she had been sexually abused by a male teacher at Community Bible Church. The teacher was not identified, but he was stated to be about forty years old with the front part of his hair being dyed blond. See Hogue Affidavit [Court Docket No. 87-3], ¶¶ 3-6. See also Exhibit (Incident Report) [Court Docket No. 87-6, pp. 2-5]. The mother further advised that the child had repeated her story to her father, although the child had then also told the father that she was making it all up. Id., ¶ 12. The mother provided the clothing the girl was wearing the day of the alleged incident, which was sealed and placed into evidence. Id., ¶ 15. A video was also obtained from the church which showed the hallways at the church. Id., ¶¶ 16, 22. Joel was at

---

[14](...continued)
reasonably.' Pearson v. Callahan, 555 U.S. 223, 231 (2009)". Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016).

[15]For purposes of summary judgment, in deciding this question the evidence is considered by the Court in the light most favorable to the Plaintiffs. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).



some point identified by church staff as being the only male teacher in the classroom on the day in question.  Id., ¶ 26.  However, Detective Hogue attests that he was advised by the church's security expert, Rick Forschner, that there was only a brief time that only one teacher was in the classroom, but that the door remained open at all times and that there were always between eight and ten children in the classroom.  Id., ¶¶ 24-25.  See also, Exhibit (Supplemental Incident Report) [Court Docket No. 87-4, p. 7].  The mother also stated that about a month before the incident, the child had told her that her dog licked her vagina, which was the same conduct the child was alleging had occurred at the church.  The mother stated that she told her daughter to not let the dog do that as it was improper, and the matter had not been pursued any further.  See Court Docket No. 99-2 (Supplemental Incident Report), p. 2.[16]

On July 8, 2015, Kendra Twitty, a forensic interviewer and therapist with Hope Haven of the LowCountry, Inc., conducted a forensic interview with the child which was audio and visually recorded.  Detective Hogue attests that he watched a live feed of the interview, and that the child repeated essentially the same story as had been told to him by her mother.  Id., ¶¶ 30-32.  See also Exhibit (Forensic Interview Report) [Court Docket No. 87-4, pp. 12-18].[17]  Hogue attests that, following the interview, Twitty informed him that the child had made a "clear disclosure" of abuse, and that the fact that the child had recanted on one occasion to her father was typical in young children

---

[16]The incident reports are considered, not for the truth of the unsworn statements therein, but as evidence of what information the police had before them at the time they were obtaining the warrants at issue.  See also Williams v. Evangelical Retirement Homes of Greater St. Louis, 594 F.2d 701, 703 (8th Cir. 1979).

[17]While the child named "Pastor Broggi" as the alleged perpetrator to Twitty, the mother testified that the child refers to everyone at the church as the Pastor.  See Court Docket No. 87-4 (Supplemental Incident Report), p. 2.



who fear disappointing their parents.  Id., ¶ ¶ 34-35.[18]

Hogue attests that he also interviewed Joel on July 8, 2015 at the police department, and that Joel stated he had not arrived at the church that day until around 11:15 a.m., which was well after the child's mother had said she handed over her child to the male and a black female at or around 9:00 a.m.  The evidence reflects that Evelyn Owens had also confirmed to the police that Owens was not there teaching in the morning class.  See Exhibit (Supplemental Incident Report) [Court Docket No. 99-2], p. 4 ["Ms. Owens stated clearly that she, Tony Delavonte and a young girl Deveda were the teachers in the morning and nobody else."].  While Joel admitted to being alone with the children later that morning for two brief periods after he had arrived,[19] he specifically denied touching any of the children, and agreed to provide a buccal swab for DNA evidence.  Hogue Affidavit, ¶ ¶ 36-43. Joel also told Hogue that he had security footage from his home to prove that he was not at the church at 9:00 a.m., and initially agreed to take a polygraph.  However, Joel told Hogue he had a doctor's appointment at the time the sheriff's office wanted to conduct the polygraph on July 13, 2015, and no polygraph was ever in fact conducted, nor was any home security footage provided to the police

---

[18]However, in her deposition Twitty denied ever forming an opinion of whether or not the child was telling the truth, and testified that although she checked a box on her interview form that said the child had disclosed sexual abuse, she did not tell Hogue that the child had made a "very strong and detailed disclosure".  Rather, Twitty testified that she has no idea if the incident really happened, and that that is "what law enforcement and DSS do".  Twitty Deposition [Court Docket No. 99-15], pp. 37, 40.  On her written interview outcome comments she also specifically stated "[i]t was difficult for A.M. to provide detailed information regarding sexual abuse due to her young developmental age of 4 years old."  See Court Docket No. 87-4, p. 13.  Hogue confirmed that A.M. was a "young" 4 year old, having only turned 4 approximately one month before the alleged incident. See Hogue Deposition [Court Docket No. 98-1], p. 4.

[19]During one of these periods, Joel stated that he stood near the door speaking to Owens who was walking the halls, while during the second time he remained near the door and there was never a time when only one child was in the room with him.  See Court Docket No. 87-4 (Supplemental Incident Report).



department prior to Joel's arrest.  Id., ¶¶ 44-49.

Hogue attests that on July 9, 2015 he and the Defendant Griffith had a followup interview with the parents of the child.  Hogue attests that during this interview, which was audio recorded, the mother of the child "confirmed that she was 100% certain that she dropped her child off with Joel Iacopelli".  Id., ¶¶ 53-55.  Hogue attests that Captain Griffith explained to the parents what had been done up to that point, that they were by that time no longer receiving cooperation from the church (the church had hired counsel), and Griffith advised the parents that at that time there was no plan to make an arrest because they did not feel they could establish probable cause.  Id., ¶¶ 56-57. The parents were further advised that the next steps of the investigation would be conducting additional interviews, analyzing the video of the church hallways that had been produced, and awaiting DNA results on the child's clothing.  Hogue attests that later that afternoon he began reviewing the video of the church hallways to create a timeline, and that the videos showed the mother and child arriving at the church at 9:24 a.m. and the mother then leaving around 9:26 a.m. after apparently having dropped off her child.  Hogue attests that that was as far as he got with the video review at that time.  Id., ¶¶ 59-61.[20]  Hogue attests that he later that day also attempted to contact Joel to confirm a time for him to take a polygraph and to see if he could obtain the video from Joel's home security system, but that when Joel could not be reached, he [Hogue] decided it would be necessary to get a search warrant to obtain Joel's home security system.[21]  Given the lack of cooperation coming from

---

[20]Hogue testified at his deposition that it would have taken one to two working days to get through all of the video footage from the church.  Hogue Deposition, [Court Docket No. 98-1], p. 32.  However, Bilyard acknowledged at his deposition that the video shows Joel arriving at the church with his son at around 11:15 a.m.  Bilyard Deposition, [Court Docket No. 98-3], p. 14.

[21]While the Iacopellis' home computers were eventually seized, the security system was not
(continued...)



the church by that point, Hogue attests that he also planned to get a search warrant for the church. Id., ¶ ¶ 64-66. However, at the end of that day, Hogue attests that he was relieved from the case by command staff, with the case being assigned to Chief Detective Bilyard at that time. Id., ¶ 67.

Solicitor Jones testified that the next day, July 10, 2015, she was speaking to Twitty about general case matters and that Twitty told her about her interview with the alleged victim and wanted to know the status of the prosecution. Jones Deposition [Court Docket No. 106-1], p. 17. Jones testified that Twitty seemed frustrated because she felt that law enforcement was not prosecuting the case. Id., p. 19. Jones testified that because Twitty had asked her about the status of the investigation and that the child had made consistent disclosures, she then called the Port Royal Police and spoke to Bilyard (who had now taken over the case from Hogue) and asked him about the child's allegations. Id., pp. 17-20. Bilyard told her about the Mom saying she had dropped the child off at school for the 9:00 a.m. Sunday school class, that she had handed the child directly to the suspect, that when the Mom had picked up the child after Sunday school the child had disclosed to her that the man with the polka dots in his hair had inappropriately touched her, that she had also made that disclosure to her father, and had also made that disclosure to Twitty during the forensic interview. Id., p. 20. Jones says that she asked Bilyard if there was anything else she needed to know, any other details that he had, and that he said no. Id., pp. 24, 91. Jones testified that she then told Bilyard that, in her opinion, a consistent disclosure three times[22] is compelling and that that is probable cause for an arrest. Id., p. 23. Jones also testified that the testimony of a victim does not have to be otherwise

_____

[21](...continued)
accessed prior to Joel's arrest. See Exhibit (Email) [Court Docket No. 87-10, p. 2].

[22]To her mother, her father, and Twitty.



19

corroborated in order to prosecute a case.  Id., p. 66.

However, in an affidavit Jones had provided (apparently to Plaintiffs' counsel) prior to her deposition having been taken,[23] Jones attested that when she contacted Bilyard to check on the status of the investigation she was under the impression that Plaintiff and the four year old child had been alone in a classroom for some period of time, and that Bilyard also informed her that the child made a "disclosure" in her Hope Haven interview.  Jones also attested that she only casually told Bilyard that it "sounds like" he had probable cause, but that she did not provide any legal opinion or recommendations or advice on how he should proceed.  Even so, Jones later conceded during her deposition that she did tell Bilyard that, based on what she had been told, there was probable cause based on the child's three consistent disclosures.  Jones Deposition [Court Docket No. 98-8], p. 79. However, Jones attested that at the preliminary hearing in the case she learned that Port Royal investigators had a great deal of information that negated that probable cause existed in this case. Jones then goes on to  attest that "these critical facts were known prior to July 10, 2015", but that Bilyard had not informed her of these facts.  Jones then sets forth seven "material and critical facts" (labeled A-G) in her affidavit that she states were not presented to her by Bilyard.  However, Jones subsequently testified at her deposition that while Bilyard "should" have had the information A - G prior to talking to her, she does not know if he had that information, and did not know what Bilyard did or did not know at the time he obtained the warrants in this case.  She also testified that although she believed Bilyard had at least some of this information at the time he spoke with her, when asked

---

[23]Jones' Deposition took place on November 2, 2017 [Court Docket No. 88-2, p. 1], while her  affidavit is dated May 2016 [Court Docket Nos. 98-4, 99-13, and 102-9].  However, the undersigned notes that the copies submitted are not signed and notarized.  Assuming this is a clerical error, a copy of the signed and sworn affidavit should be submitted within the deadline for the parties to file objections.  Otherwise, this affidavit is not in proper form to be considered.



if she had any evidence of that, she testified "no", that that was just her personal opinion.  Jones Deposition [Court Docket No. 88-2], pp. 30, 70-71; see also Jones Deposition [Court Docket No. 106-1], p. 71.

Some of the "critical facts" (A-G) listed by Jones in her affidavit as being facts that Bilyard purportedly knew at the time of their conversation would have been learned only through a comprehensive review of the videotape evidence, which Bilyard had not undertaken at the time he obtained the arrest warrant.[24]  However, Bilyard did have the witness statements from the supplemental incident report, and the record reflects that after "Bilyard assumed the case, all case files were transferred to him as well as the audio recordings and [he] was briefed on the case."  See Court Docket No. 99-2.

Looking then at the "facts" of which Jones attests Bilyard had knowledge at the time of their conversation but did not tell her, with regard to (a) [that Bilyard knew the mother could not have dropped her child off with Joel, as she claimed], Bilyard had the statements not only from Joel, but also from Mrs. Owens and Pastor Broggi, that Joel was not the teacher for the 9:00 a.m. class and arrived only for the 11:00 a.m. class.  These statements conflict with the child's mother's statement that she was 100% percent positive that she dropped her child off at 9:00 a.m. with Joel.  Id.  When asked in his deposition, "[a]nd from Joel's interview and prior to his arrest, you were able to confirm that his statement that he got there about 11:15 was, in fact, true?", Bilyard testified, "[w]ell,

---

[24]The evidence submitted indicates that Bilyard did not view the video showing Joel in the hallway at 11:15 a.m. or the children coming and going from the classroom until July 13, 2015.  But see also Bilyard Deposition [Court Docket No. 98-3], p. 14.



according to the cameras, yes." See Bilyard Deposition (Court Docket No. 98-3), p. 14.[25]

With regard to (b) [that Joel was never alone with the alleged victim], Bilyard had statements not only from Joel, but from the church security expert, that other children were in the room at all times. See Court Docket No. 99-2. Twitty had also stated that the child was vague about whether another child, who was her friend, was in the room with her at the time of the alleged assault. Id. With regard to (c) [that the classroom doors were always open to the hallways], Bilyard had statements not just from Joel but also from the security expert that the door was always open. Id.

Fact (d) relates solely to the video evidence, which Bilyard had apparently not viewed prior to obtaining the arrest warrant. With regard to (e) [that Joel was never alone with the victim], Joel stated that there were only two very brief periods when he was alone with the children, that the door was always open, and that he was talking with Mrs. Owens during one of these times. The security officer also stated that there was only one time when Joel was alone (presumably the time when he was not talking with Mrs. Owens in the door), but that there were other children in the classroom at that time with the door open. Id.

With regard to (f) [that the child was wearing spandex bicycle shorts, not panties, at the time of the alleged assault],[26] it is not clear whether Bilyard viewed the child's clothing prior to Joel's arrest. However, Jones later acknowledged at her deposition that the underwear the victim was

---

[25]This testimony is a little confusing since it appears to imply that Bilyard had viewed the video evidence showing the time of Joel's arrival at the church prior to Joel's arrest, although that is actually not the case. However, in any event, Bilyard did have the supplemental incident report showing where three individuals had told the police that Joel did not arrive until around 11:00 a.m., and the police had video evidence to support these statements (whether or not it had been viewed).

[26]The implication here is that the spandex shorts were not an undergarment that could be "moved aside" as stated in the arrest warrant affidavit.



wearing was not bicycle shorts, but cotton shorts that did not have a long inseam but were fitted with the inseam reasonably close up to the private parts of the child, so that does not appear to be any type of material omission by Bilyard.  <u>See</u> <u>Jones Deposition</u> [Court Docket No. 98-8], pp. 73-74.

With regard to (g) [that the victim had recanted her story],[27] it is clearly stated in the incident report that the child had told her father that she was making up the story.  <u>Id</u>.  However, Jones also testified that, in her experience with prosecuting CSC cases, sometimes victims do recant their testimony, although she stated that was not normally the case.  Jones also conceded that Twitty had told her of common things that happen with children who are abused, and that recantation is one of them.  <u>Id</u>., p. 72.  Jones further testified that Twitty told her that she [Twitty] thought the disclosure the child had made was a good disclosure; <u>Id</u>., p. 76; and that, in her opinion and in her experience with child CFC cases, a consistent disclosure three times is compelling and is probable cause for an arrest, an opinion which she relayed to Bilyard.  <u>Id</u>. [Court Docket 106-1], p. 23.

In any event, Jones attested that if she had been provided with this information (A-G) by Bilyard that she would have said there was "no probable cause."  <u>See</u> <u>Jones Affidavit</u> [Court Docket No. 99-13], ¶ 13.  Jones further testified at her deposition that Bilyard also did not tell her that the child had alleged a month earlier that a dog had licked her vagina (conduct similar to what she claimed Joel had done]; <u>see</u> <u>Jones Deposition</u> [Court Docket No. 98-8], p. 89; and did not tell her that Joel had voluntarily given a one hour interview.  <u>Id</u>.

---

[27]Jones actually states in her affidavit that Bilyard withheld from her the fact that the alleged victim had "recanted her story several times".  However, based on the record before the Court, the only recantation prior to Plaintiff's arrest appears to be the one time the child told the story to her father but then also stated that she had lied about it.  Although Jones testified that Mary Jordan Lempesis told her that there were three inconsistent disclosures, no additional information is provided about the alleged any other inconsistent disclosures.  <u>See</u> Jones Deposition [Court Docket No. 98-8], pp. 45-46; [Court Docket No. 99-12], p. 2.



Bilyard testified at his deposition that after his conversation with Jones he spoke to Griffith (his supervisor), and that the reason he then proceeded to get the arrest warrant at that time was because he "was told to" by Griffith. Bilyard Deposition [Court Docket No. 99-10], p. 17. Bilyard testified that he would have otherwise continued with the investigation and obtained more information before proceeding, but that Griffith wanted him to go ahead and obtain the warrant based on his conversation with the Solicitor's Office. Id., p. 32. Even so, Bilyard testified that he did not think the case was weak at the time he obtained the warrant because they dealt with Hope Haven and their interview process "all the time and they are basically spot on", and that he believed there was enough probable cause to obtain a warrant at that time. Id., pp. 29, 36. As for contacting DSS, Bilyard testified that Jones instructed him to do that. However, Jones testified that she did not recommend to Bilyard that DSS be contacted about the case, and that there was no reason she would have done that. Jones Deposition [Court Docket No. 98-8], pp. 77-78.

For his part, Griffith testified that he told the child's parents in the recorded interview on July 9, 2015 that he did not feel there was probable cause for an arrest at that time. See Griffith Deposition [Court Docket No. 89-2], p. 19. Griffith also testified that he did not instruct Bilyard to obtain a warrant, but told him that it was up to him and that he should proceed if he felt "confident in that". Griffith Deposition [Court Docket No. 99-14], p. 17. Griffith further testified at his deposition that during his conversation with Bilyard that Bilyard's opinion was that the case weak but that there was probable cause. Id., p. 17. Griffith testified that when the child's mother called and asked him what had changed, he told her that they had conferred with the Solicitor's Office and that the Solicitor's Office felt they had enough probable cause. Griffith Deposition, [Court Docket No. 89-2], p. 19.



24

The evidence confirms that following his conversation with Griffith, Bilyard submitted an affidavit seeking an arrest warrant to Beaufort County Magistrate Judge Richard Brooks. Brooks attests that at the time he signed the arrest warrant he was under the impression that Joel and the four year old child had been left alone in the classroom and that the evidence was that the victim's panties had been moved aside in order for Joel to accomplish the assault. However, Brooks attests that at the preliminary hearing he learned critical facts that had not been presented to him at time the affidavit was executed, which led him to conclude that there was no probable cause for the charge. These facts include the same seven facts (A-G) set forth by Jones in her affidavit. See generally, Brooks Affidavit (Court Docket No. 98-6).

Finally, when Hogue was asked about the arrest warrant being obtained and whether he knew of any reason why an arrest needed to be expedited in this case, he testified that "if this is a true fact that this thing occurred and if the fact that the church does not seem to be concerned about it, then you have an issue with us knowingly allowing what could potentially be a predator in a group full of children. That would be the only speculation that I have, and that is speculation. Nobody said that directly". Hogue Deposition, p. 32. Brian Battertin (an expert retained by the Defendants) testified that, in his opinion, at the time Bilyard obtained the arrest warrant, a reasonable officer could have had the belief that there was probable cause that the crime alleged had occurred. Battertin Deposition, p. 158. However, he also testified that he knew of no reason why police could not have waited until after they had obtained the DNA results or the results of a polygraph before arresting Joel; Id; although one reason for proceeding to obtain the warrant when they did would have been because there were children in the home. Battertin Deposition, p. 194.

After careful review and consideration of the evidence presented to the Court on this



25

issue, the undersigned finds and concludes that there is a sufficient question of fact as to whether a "reasonable and prudent" person would have concluded that there was probable cause for Joel's arrest to survive summary judgment. Robinson, 662 F.Appx. at 220. At the time Bilyard obtained the arrest warrant for Joel, he had evidence showing that the child's mother had reported that her child had stated she had been sexually abused by a male Sunday school teacher, that the child's mother had identified Joel as being the teacher with whom she had left her child, and that the child had also repeated her story to a Hope Haven forensic interviewer and therapist. However, Bilyard also knew that not only Joel, but at least two other witnesses from the church, had told the police that Joel did not even arrive at the church until around 11:00 a.m. (well after the child's mother claimed she had left her child with him), that the child had earlier claimed a dog had done the same thing to her that she was now claiming Joel had done to her, that at least two witnesses had told the police that Joel was never alone in the Sunday school room with the child, and that the child had also recanted her claim (to her father) on at least one occasion. See United States v. Beckham, 325 F.Supp. 2d 678, 688 (E.D.Va. 2004) [Finding that even where police have a victim's identification of a suspect or report of a crime, other independent exculpatory evidence or substantial evidence of the witnesses' own unreliability that is known by the investigating officer can outweigh the victim's identification or report such that probable cause will not exist]; cf. Ruff v. The Bd. of Regents of the University of New Mexico, No. 16-1140, 2018 WL 565705, at * 8 (D.N.M. Jan. 24, 2018) [Where information is omitted from the arrest warrant application, the court must determine whether probable cause exists by examining the affidavit as if the omitted information had been included, and inquiring if the affidavit would then still have given rise to probable cause for the warrant] (internal quotations and citations omitted).



Moreover, in addition to the evidence Bilyard had calling into question the child's claim, Bilyard also knew at the time he obtained the arrest warrant that they had video evidence from both the church and the home that could have either confirmed or refuted the child's claim, as well as clothing that had been sent off for DNA testing, the results of which could also have confirmed or refuted the child's claim, evidence which he had not yet viewed. Cf. Beckham, 325 F.Supp. 2d at 688 [Finding that where information from or about a case would lead a reasonable officer to be suspicious as to whether the crime alleged had been committed, the officer should conduct further investigation before making an arrest]; see also Wesley v. Rigney, No. 10-51, 2016 WL 853505, at * 6 (E.D.Ky. Mar. 3, 2016) [Finding that there was a sufficient genuine issue of material fact as to the recklessness of the defendant's actions in obtaining a warrant in the face of contradictory evidence to submit the claim to the jury]. While, normally, the fact that a neutral judge has issued an arrest warrant shows that an officer acted in an objectively reasonable manner, based on the facts just recited, there is again a question of fact for the jury as to whether Bilyard, in submitting his affidavit to the judge, left out material facts that he "knew would negate probable cause". Miller v. Prince George's County, Md., 475 F.3d 621, 627 (4th Cir. 2007); Evans v. Chalmers, 703 F.3d 636, 649-650 (4th Cir. 2012), citing Franks v. Delaware, 438 U.S. 154, 155-156 (1978); see also United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990). Therefore, Bilyard is not entitled to summary judgment on Joel's false arrest claim.

Griffith is also not entitled to summary judgment on this claim. Although Griffith denies that he instructed Bilyard to obtain the arrest warrant in this case, Bilyard testified that he *was* so instructed, and for purposes of summary judgment the undersigned has assumed Bilyard's testimony on this point to be true. Pittman, 87 F.3d at 118; see also Anderson v. Liberty Lobby, Inc.,



477 U.S. 247, 250-252 (1986) [At summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," are all functions for the trier of fact]. Additionally, the fact that Bilyard told Griffith that the Solicitor had told Bilyard there was sufficient probable cause for an arrest (assuming for purposes of summary judgment that that is in fact what Bilyard told Griffith) does not serve to absolve Griffith from potential liability for his own conduct. The evidence reflects that Griffith had been briefed on the facts of the case prior to the arrest warrant being issued, and that based on the information and evidence known to the police he had himself informed the child's parents that the police did not have sufficient probable cause for an arrest at that time. See Griffith Deposition (Court Docket No. 89-2), p. 19; Hogue Affidavit [Court Docket No. 87-3], ¶ ¶ 53-58. Hence, this is not a case where Joel is attempting to hold Griffith responsible solely on the basis of supervisory liability. Rather, the evidence (considered in the light most favorable to the Plaintiffs) is that Griffith himself had been briefed on the investigation and knew what evidence the police had collected up to the point of the arrest warrant being obtained, that he had himself concluded (at least so he told the child's parents) that this evidence was not sufficient to establish probable cause for an arrest at that time, but that he then nonetheless proceeded to order Bilyard to obtain an arrest warrant. This evidence is enough to create a genuine issue of fact as to whether a reasonable, prudent officer would have believed there was probable cause to order Joel's arrest to survive summary judgment. See Wesley, 2016 WL 853505, at * 6 [Finding that where there was a sufficient genuine issue of material fact as to the recklessness of the defendant's actions in obtaining a warrant in the face of contradictory evidence, the case should be submitted to the jury]; DeFillippo, 443 U.S. at 37 [whether there is probable cause



to justify an arrest turns on the facts and circumstances known to the officer at the time].

Finally, as it was clearly established in 2015 that a law enforcement officer could be held liable for false arrest if a reasonable and prudent person could conclude that the evidence as a whole was not sufficient to establish probable cause sufficient to justify the arrest, neither defendant is entitled to qualified immunity on Joel's false arrest claim. Meyers, 713 F.3d at 731 [Qualified immunity only shields government officials from liability if their conduct does not violate a clearly established statutory or constitutional right within the knowledge of a reasonable person]; Wesley v. Campbell, 779 F.3d 421, 437 (6th Cir. 2015) [Noting that police officer is not entitled to qualified immunity where "a triable issue of fact exists regarding both the materiality of facts [the officer] omitted from [his] warrant application and whether these omissions demonstrate deliberateness or a reckless disregard for the truth"] (internal quotations omitted); cf. Vathekan v. Prince George County, 154 F.3d 173, 178 (4th Cir. 1998) [summary judgment on qualified immunity grounds improper where there is a material factual dispute regarding the conduct of the Defendant] (excessive force case).

Therefore, Griffith and Bilyard are not entitled to summary judgment on Joel's false arrest claim. Muhammed v. Klotz, 36 F.Supp. 2d 240, 243 (E.D.Pa. 1999)["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."], citing Anderson, 477 U.S. at 250-252; see also Brinegar v. United States, 338 U.S. 160, 175-176 (1949) ["probable cause [requires] a reasonable ground for belief of guilt . . . To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice"]; cf. Sornberger v.City of Knoxville, Ill., 434 F.3d 1006, 1016 (7th Cir. 2006) [Denying qualified immunity and discussing that a police



29

officer cannot close his eyes to facts that would help clarify the circumstances of an arrest where officers had obtained search warrant for the search of a computer which would have allowed investigators to confirm the individual's alibi].

**Plaintiffs' claims relating to issuance of the search warrants**. Both Plaintiffs assert a federal claim against Bilyard for violating their constitutional right to be free from unreasonable searches and seizures relating to the search warrants issued in this case. Plaintiffs claim that the search warrants were "facially invalid", that they were therefore unlawfully deprived of their property, that at least one of the search warrants was not even signed by a judicial officer, and that Bilyard unreasonably invaded their privacy and disrupted their family life through the execution of these improper search warrants. Joel further asserts a separate claim against Griffith, alleging that Griffith is also liable because he ordered his subordinate (Bilyard) to obtain the "facially invalid" search warrants.

A search or seizure must be "accomplished pursuant to a judicial warrant issued upon [a finding of] probable cause". Skinner v. Railway Labor Executives, Ass'n, 489 U.S. 602, 619 (1989). Probable cause for issuance of a search warrant is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place". Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause for a search warrants exists when there are reasonably trustworthy facts which, given the totality of circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of the crime and will be present at the time and place of the search. United States v. Swarez, 906 F.2d 977, 984 (4th Cir. 1990). While an otherwise facially valid search warrant may be found to violate the Fourth Amendment if it contains false or misleading statements that are necessary to the finding of probable cause; Wilkes v. Young,



28 F.3d 1362, 1365 (4th Cir. 1994), <u>cert denied</u>, 513 U.S. 1151 (1995). <u>See generally</u> <u>Abdulahad v.</u>

<u>Chesterfield County Sheriff's Dept.</u>, No. 06-2642, 2008 WL 4442600, at * 4 (D.S.C. Sept. 25, 2008);

in order for the Plaintiffs to survive summary judgment on the claims asserted in their cases, the

evidence must be sufficient to raise a general issue of fact that false statements were included by the

affiant in the warrant affidavit (assuming the affidavit in fact contains such a statement) either

knowingly and intentionally, or with reckless disregard for the truth. <u>Franks</u>, 438 U.S. at 156.

      After careful consideration of Plaintiffs' search warrant claims and in light of the

applicable caselaw, the undersigned concludes that Bilyard and Griffith are entitled to summary

judgment on these claims. Hogue attests that based on the mother's statements and the child's

allegations, the police had obtained copies of the church videotape from the church's security expert

by July 2, 2015. Hogue Affidavit [Court Docket No. 87-3], ¶ ¶ 22-23. A forensic interviewer and

therapist had also interviewed the child (which the police watched on a live feed), wherein the child

had repeated essentially the same story as had been related to the police by her mother (that Joel had

sexually molested the child). <u>Id.</u>, ¶ ¶ 30-32. Joel had also been interviewed by the police, and while

he denied ever sexually molesting the child, he did admit to being the only adult in the room with the

children on two occasions. <u>Id.</u>, ¶ ¶ 36-40. The police had also been told that Joel had security footage

at his home that (according to Joel) could prove where he was when the child had been dropped off

at the church, but when Joel had been asked to provide that footage to the police, he had stated that

he might have trouble getting it to work. Hogue also attests that while Joel agreed to take a polygraph,

he stated he had another appointment at the time suggested by the police. <u>Id.</u>, ¶ ¶ 44, 46-48. Hogue

attests that the home video footage was never provided to the police department prior to Joel's arrest,

and that given Joel's hesitation about the polygraph date, he did not believe that Joel had committed



at that point to take a polygraph exam.  Id., ¶ ¶ 45, 49.

In addition to this information having been gathered through their investigaton, Detective Hogue also went back to the church on July 9, 2015 to speak with Owens and Pastor Broggi. However, he was advised at that time that the church had retained counsel, and that any further communication would have to go through the church's attorney.  Id., ¶ ¶ 50-52.  Hogue and Griffith then met with the child's parents later that afternoon, at which time the mother again confirmed to them that she was "100 % certain" that it was Joel she had dropped her child off with.  Id., ¶ ¶ 53-54. Then, when Hogue met with Pastor Broggi and his counsel later that day to discuss a subpoena that had been served on the church, Broggi tried to take the paperwork and became irate.  Id., ¶ ¶ 61-62. Hogue attests that he then attempted to contact Joel hoping to confirm a date for a polygraph to be taken and to see if the video from the home security system was available, but was again met with "negative results", and that when Joel could not be reached, Hogue decided it would be necessary to get a search warrant for Joel's home security system.  Id., ¶ ¶ 63-65.  Hogue also planned to get a search warrant for church records to gather information from the church relative to potential witnesses, both to the crime with respect to any potential exculpatory information.  Id., ¶ 66.

The following day (the day Joel was arrested), the church dropped off some records that had previously been requested, which the police found to be incomplete and in some respects contradictory.  Id., ¶ ¶ 69-72.  Bilyard (who had by that time taken over the investigation form Hogue) testified that he then proceeded to obtain search warrants for the church's records as well as for computer and video records from the Iacopelli residence.[28]  With respect specifically to the search

---

[28]The search warrant affidavit was submitted to the Judge in conjunction with the arrest warrant affidavit.  See Court Docket 99-19.



warrants for the Iacopellis, Bilyard obtained a search warrant from Judge Brooks on July 10, 2015 for "any and all items related to the security recording of video of the said premises, surveillance equipment or computer which stores the video of said premises and the cellular telephone". As to the justification for obtaining this search warrant, Bilyard attested that "on 07-08-2015 [Joel] told officers that there is video from his home security systems, located at [the residence], which indicate when he departed for the Community Bible Church. [Joel] also maintains an application on his cellular telephone which was shown to officers that has direct access to his home security system".[29] See Exhibit [Search Warrant] (Court Docket No. 99-18), pp. 2-3. Various computer equipment and the home security unit were seized as a result of the execution of this warrant. Id., p. 4.

When the police subsequently learned as a result of a monitored conversation between Joel and Marianne that there were two more computers at the house which had not been turned over, Bilyard obtained additional warrants on July 16, 2015. Bilyard Deposition [Court Docket No. 98-3], p. 12. There are three search warrants in the record that Bilyard obtained on July 16, 2015. One is for a black iPhone belonging to Joel (serial number unknown), one is for "any computers belonging to Joel or any work computers that he has access to", and one is for a Microsoft Surface tablet that had previously been seized from Joel's home during the earlier search. The affidavits for these search warrants all contained the same general language, as follows:

On June 29, 2015, the Port Royal Police Department initiated an investigation into a

---

[29]While not set forth as a justification in the warrant, Bilyard testified that in these types of cases it is also common to find evidence related to pedophilia on home computers, although they had no specific information that they would find pornography or anything like that on the home computers. Bilyard Deposition [Court Docket No. 98-3], pp. 8-9; but see United States v. Thomas, No. 16-001, 2016 WL 7324095 at * 1 (W.D.Va. Dec. 15, 2016) ["Under controlling Fourth Circuit precedent, evidence of sexual assault, standing alone, is insufficient to justify a search warrant for child pornography".] (citing United States v. Doyle, 650 F.3d 460, 472 (4th Cir. 2011)).



criminal sexual conduct with a minor case allegedly committed by Joel Iacopelli. On July 9, 2015 a forensic interview was conducted on the victim who did make a full disclosure. Subsequent to this and further investigation, Joel Iacopelli was arrested at his home and pursuant to a lawful search of his home, several electronic devices belonging to Joel Iacopelli were seized.

It is common knowledge that offenders of these types of cases often times access and/or store explicit and graphic images or video of children and that it is possible that the electronic devices belonging to Joel Iacopelli and seized from his home do contain such images, video files, or internet history files.

The affidavits for the search warrants seeking a black iPhone belonging to Joel and for any computers belonging to Joel or any work computers that he has access to, also both contain the following additional language:

Joel Iacopelli is known to have a video surveillance system at his residence and there is reason to believe that his electronic devices has an application on them to either access the security system or has video footage stored on them.

Finally, the affidavit for the search warrant seeking any computers belonging to Joel and any work computers that he has access to also contains the following additional language:

Per his jail calls he [Joel] told his wife that he has two other computers in his car, one of them was a work computer and the other was his own personal computer and Joel told his wife to get them out of this vehicle and take them in the house. Another jail call the Defendant Joel Iacopelli did tell his wife that he did not want the police to get his computers.

See Exhibits [Search Warrants] (Court Docket No. 99-19), p. 3.

Hogue attests that on July 17, 2015 he and Bilyard went to the Iacopelli home to retrieve the computer which Marianne had previously indicated to him she did not have, but that Marianne subsequently admitted to them that she had taken the computer to her attorney's office. See Marianne Deposition [Court Docket No. 99-20], pp. 195-196; see also Hogue Affidavit (Court Docket No. 87-3), ¶ ¶ 73-75. After being advised by the attorney the police would need a search warrant to



obtain the computers left there by Marianne, a search warrant was obtained for the attorney's office

the next morning, following which the attorney turned over an Elitebook, a Toshiba, a Dell Inspirion,

and a MacBook.  Hogue Affidavit, (Court Docket No. 87-3), ¶¶ 73-79.  The affidavit for the search

warrant for the attorney's office stated, in part, as follows:

> On July 16, 2015 a search warrant was obtained for the home of Joel Iacopelli to seize,
> among other things, two laptops belonging to him.  On the same day, this affiant
> executed the warrant at [Joel's home] and met with Ms. Marianne Iacopelli.  Ms.
> Iacopelli relinquished Joel Iacopelli's personal computer and stated that his work
> computer had been picked up by a courier service that his employer United Health
> Group had hired.  This affiant learned through further investigation that Ms. Iacopelli
> lied and had in fact give that computer as well as several others to Jared Newman, Joel
> Iacopelli's defense attorney.  This affiant spoke with Jared Newman and confirmed
> that he does in fact have in his possession the laptop computers.

See Exhibit [Search Warrant] (Court Docket No. 99-19), pp. 14-15.

Finally, two other search warrants were obtained on July 20, 2015 to search the

computers and home videos that were seized, and arrangements were made with the Beaufort County

Sheriff's Office the following day to have their computer experts search the computers.  Hogue

Affidavit, (Court Docket No. 87-3), ¶ 80; see also Exhibit [Search Warrant] (Court Docket No. 99-19),

pp. 19-20, 23-24.  The affidavit for the July 20, 2015 search warrant for the computer equipment read

as follows:

> On June 29, 2015 the Port Royal Police Department initiated an investigation into a
> criminal sexual conduct with a minor case allegedly committed by Joel Iacopelli.  On
> July 9, 2015 a forensic interview was conducted on the victim, who did make a full
> disclosure.  Subsequent to this and further investigation, Joel Iacopelli was arrested at
> his home and pursuant to a lawful search of his home, several of the electronic devices
> belonging to Joe Iacopelli were seized.  Based on further investigation the above
> electronic devices were discovered to have been turned over to Jared Newman, Joel
> Iacopelli's attorney.  These electronic devices were obtain through a lawful search
> warrant.  It is common knowledge that offenders of these types of cases often access
> and/or store explicit and graphic images or video of children and that is possible that
> the electronic devices belonging to Joel Iacopelli and seized from him contain such



images, video files, or internet history files.

Id., p. 20.

The affidavit for the video footage warrant was essentially the same, but also contained the following language:

> During the course of this investigation I learned that Joel Iacopelli has a video security surveillance system installed at his residence. When Joel Iacopelli was interviewed regarding this system he told officers that on 06-28-2015 (date of offense) he did not leave his residence until after 10:00 but we have information that he left prior to that. We have reason to believe that video footage stored on the DVR will show what time he actually left his home.

Id., p. 24.

Hogue attests that while the investigation continued after Joel's arrest, complete searches were not performed and/or results provided prior to the close of the case, and that the iPhone was eventually returned to Joel on August 27, 2015. See, Hogue Affidavit (Court Docket No. 87-3), ¶¶ 82-83. Hogue further attests that after the charges against Joel were dismissed, law enforcement was unsure if the Solicitor was going to request a grand jury indictment in the matter since the Solicitor was still awaiting the DNA evidence analysis to be returned from the lab before making that decision. The Sheriff's office also continued to attempt to review the information on the computers to make sure nothing of any importance was missed. However, most of the items remained in evidence at Port Royal uninspected or at the Sheriff's Office until some were returned to Port Royal in November and some in December 2015. Hogue attests that when the initial DNA results were returned from the Beaufort County lab on October 7, 2015, the results excluded Joel from any DNA found on the clothing. See also Hogue Deposition, (Court Docket No. 98-1), p. 35. Subsequently, on December 10, 2015, the Solicitor's office advised Port Royal that it was okay to release the



computers back to the Iacopellis, and the computers and devices were thereafter returned to them on December 16, 2015, with nothing of evidentiary value having been found and several having not even been accessed. Id., ¶¶ 87-93. See also Exhibit (Email) [Court Docket No. 87-10, p. 1].

This evidence does not show, or create an issue of fact, that Bilyard committed a constitutional violation by obtaining these search warrants in this case. Cf. United States v Bourgeois, No. 10-25, 2010 WL 3613822 (D.Minn. Sept. 7, 2010); United States v. Hansel, 524 F.3d 841, 845 (8th Cir. 2008) [Whether probable cause exists to issue a search warrant is based on the totality of the circumstances].  That there is a genuine issue of fact as to whether Bilyard had sufficient probable cause to obtain an *arrest* warrant for Joel based on the information he had available is separate from the question of whether he had sufficient probable cause to obtain a *search* warrant. Gordon v. Beary, No. 08-73, 2010 WL 11507697, at * 7 (M.D.Fla. Apr. 12, 2010) [Noting that while the standards for analyzing the constitutionality of a search and arrest warrant are similar, they are not the same].  While both types of warrants must meet the probable cause standard, the standard for a search warrant is whether there is probable cause (meaning more likely than not) that evidence of a crime may be found in a particular place. Gates, 462 U.S. at 238; see also United States v. Grubbs, 547 U.S. 90, 95 (2006) ["Probable cause exists when there is a fair probability that . . . evidence of a crime will be found in a particular place"] (internal quotation marks omitted).  In other words, are there sufficient reasonably trustworthy facts that would lead a prudent person to believe that evidence of a crime may be found at the object of the search.  Here, Bilyard had evidence (based on the mother's statements and the child's forensic interview) that Joel may have been involved in sexually abusing a minor, and the very purpose of his investigation (to include his obtaining the search warrants at issue) was to determine whether there was evidence to support the statements by the child and the child's mother about what



had occurred.[30]

Under the facts of this case, even crediting Joel's denial of the claim and dispute between the parties about what time Joel had arrived at the church that morning, a reasonable officer could have - and given the circumstances here, should have - taken the victim's claim seriously. Easton v. City of Boulder, 776 F.2d 1441, 1449-1450 (10th Cir. 1985) [Holding that statements of an alleged victim or witness, even a minor child, can be sufficient to establish probable cause to support the issuance of a warrant]; cf. Evan v. Chalmers, 703 F.3d at 653-654. With respect search warrants, probable cause only requires reasonably trustworthy information as would warrant a prudent man in believing that the targeted individual has committed an offense, it does not require an actual showing of such activity. Barham v. Town of Greybull, Wyoming, No. 10-261, 2011 WL 2710319, at * 7 (D.Wy. July 11, 2011); see also DeFillippo, 443 U.S. at 36; Illinois v. Gates, 462 U.S. 213, 245 (1983); Beck v. Ohio, 379 U.S. 89, 91 (1964). That Bilyard did not *know* whether evidence supportive of the victim's claims would be found on Joel's computers or home videos is irrelevant, as long as the search warrant affidavits set forth a "fair probability" that evidence relating to the crime alleged would be found on those instruments. Evans, 703 F.3d at 654; Rodriguez v. City of Bridge Port, No. 03-1597, 2005 WL 3307274, at * 3 (D.Conn. Dec. 2, 2005) [Once it is established that probable cause exists that a crime has been committed, a warrant may issue for the search of any property which the judge has probable cause to believe may be the place of concealment of evidence of the crime alleged], citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978).

In this case, in response to evidence received, including statements from Joel himself,

---

[30]It is worth noting that one of Joel's main complaints with respect to his false arrest claim is that Bilyard should have conducted further investigation of the victim's claims before seeking an arrest warrant against him.



that there was a home video system and related electronic hardware on which probative evidence might be found showing Joel's location at the time of the crime alleged, Bilyard obtained a search warrant for Joel's security video and surveillance equipment and any computers which may store the video and Joel's cellular telephone.  See Court Docket No. 99-18, pp. 2-3.  Then, after learning through a monitored jail conversation between Joel and Marianne that Joel had more computers that the police had not seized and that he wanted Marianne to make sure the police did not find them, Bilyard obtained new warrants seeking these computers and Joel's iPhone, the affidavits for which contained the same information relating to the surveillance and computer equipment presented in the earlier warrant, and including also (with respect to the computers) the new information that Joel had sought to hide this equipment from the police and noting that sometimes evidence of child pedophilia is found on electronic equipment in these types of cases.[31]  See Court Docket Nos. 99-18, pp. 12-13; 99-19, pp. 2-3.  The other warrants (including the warrant to Jared Newman, to whom Marianne turned over the computers) are similar and contain similar language.

The fact that items or materials implicating Joel in any criminal activity were not found as a result of the execution of these search warrants does vitiate probable cause, as there is no requirement that incriminating items actually be found as a result of the execution of a warrant in order for there have been probable cause for the warrant at its initiation.  See Barham, 2011 WL 2710319,

---

[31]While Bilyard had no specific information that evidence of pedophilia would be found on Joel's computers, Joel's efforts to hide these computers from the police so as to impede their investigation would have raised the suspicions of a reasonable officer, and in any event the rationale for the seizure of these computers previously presented still applied.  See Illinois v. Gates, 462 U.S. 213, 238 (1983) [Finding warrant proper where, given all of the circumstances set forth in the affidavit, there was a fair probability that evidence of a crime would be found on computers or media devices]; see also United States v. Thompson, 210 F.3d 855, 860 (8th Cir. 2000) [Judges "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant"].



at * 10. There is also nothing untrue or misleading in the affidavits provided by Bilyard insofar as he was seeking search warrants based on the alleged crime being investigated, and the material sought (information contained on computers and other electronic equipment a well as the home video system) was reasonably related to the type of crime being investigated and the specific information that had been uncovered by the police. See, discussion, supra. Further, while the language used for what was being sought may have been improved on, the descriptions of what information or evidence was being sought through the issuance of these warrants was not unconstitutionally vague when viewed as a whole. Rodriguez, 2005 WL 3307274, at * 3-4 [Warrant proper where police had information suggesting that evidence relating to the crime alleged would be found in the place identified as well as belief based on statements that the accused was concealing evidence]; Gates, 462 U.S. at 235 ["probable cause only requires the probability, and not a prima facie showing, of criminal activity"]; see United States v. Scott, No. 10-677, 2011 WL 1474187 at * 16 (E.D.Pa. Apr. 15, 2011) [Probable cause existed for search warrant based on the totality of the circumstances and four corners of the affidavit as a whole]. The independent determination by a neutral and detached judge that the search warrants should issue based on the information provided also substantiates the probable cause determination. Barham, 2011 WL 2710319, at * 11, citing Gates, 426 U.S. at 236 ["A search warrant comports with the Fourth Amendment if it was issued by a magistrate [who] had a substantial basis for conclud[ing] that a search would uncover evidence of wrongdoing . . . ] (quotations and citations omitted); cf. United States v Solomon, 432 F.3d 824, 827 (8th Cir. 2005) [On a review for probable cause, Courts "accord[ ] great deference to magistrate's determination as to whether an affidavit establishes probable cause"].

        Plaintiff's argument that at least one of the search warrants was otherwise invalid



40

because it had not been signed by the judge is also without merit.  While one of the search warrants left with Marianne at the premises may in fact have been an unsigned copy, the evidence plainly shows that the original search warrant was signed; see Exhibit [Search Warrants] (Court Docket No. 99-18), pp. 16-18; (Court Docket No. 99-19), pp. 2-3; and the fact that an unsigned copy may have been left with Marianne at the residence is not evidence of a constitutional violation.  Indeed, no constitutional violation would have occurred even if Bilyard had left no search warrant at all.  Abdulahad, 2008 WL 4442600 at * 6 ["The failure to leave a copy of a search warrant does not render the search unreasonable under the Fourth Amendment"]; see also Darmon v. Burgess, 388 F.3d 609 (8th Cir. 2004) [same]; United States v. Simons, 206 F.3d 392, 403 (4th Cir. 2000) [same].  Marianne's obvious discomfort at having her home searched and receiving instructions and directions from law enforcement personnel during the search is also not a constitutional violation.  Abdulahad, 2008 WL 4442600 at * 6 ["When a warrant authorized a law enforcement officer to enter a premises to conduct a search, the warrant implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted"], quoting Mazuz v. Maryland, 442 F.3d 217 (4th Cir. 2006).  Therefore, Bilyard is entitled to summary judgment on these claims.

Finally, with respect to Joel's claim against Griffith, Plaintiffs have provided no evidence to show that Griffith had any direct involvement in obtaining the search warrants in this case, or in the execution of any of these search warrants.  Therefore, even if Plaintiffs' evidence created a genuine issue of fact as to whether Bilyard had committed some type of constitutional violation with respect to the obtaining and execution of these search warrants (which the undersigned does not find), there is no basis presented in the evidence for why Griffith would be liable for any such conduct. Griffith has no liability merely because he was Bilyard's boss, as the doctrines of vicarious liability



41

and respondeat superior are not applicable in Section 1983 cases. See Vinnedge v. Gibbs, 550 F.2d 926, 927-929 and n. 1-2 (4th Cir. 1977). Rather, as Bilyard's supervisor, Griffith may be held liable in a § 1983 action only for an official policy or custom for which he is responsible and which resulted in illegal action. See generally, Monell v. Dep't of Social Service Scrvs., 436 U.S. 658, 694 (1978). Joel has presented no evidence of any such policy or custom here. While Joel alleged in his amended Complaint that Griffith ordered Bilyard to obtain (facially invalid) search warrants, there is no evidence whatsoever that Griffith ordered Bilyard to engage in any improper conduct. Therefore, even if the Court were to otherwise find that the claims made by both Plaintiffs against Bilyard are sufficient to survive summary judgment, Griffith is entitled to dismissal of the search warrant claim Joel makes against him. Vinnedge, 550 F.2d at 927-929.

**Plaintiffs' claims relating to DSS investigation**. Both Plaintiffs assert a federal claim against Natasha Williams for violating a constitutional right to be free from governmental interference in their family relationship and for unreasonably invading their federally protected interests in their family, home and hearth.[32] As an employee of DSS, Williams is subject to suit under § 1983 for damages in her individual capacity. Gomez v. Toledo, 446 U.S. 635, 640 (1980); Inmates v. Owens, 561 F.2d 560 (4th Cir. 1977); West v. Atkins, 487 U.S. 42, 48 (1988). However, the evidence provided

---

[32]Marianne also originally had a separate cause of action asserting this same claim (Marianne's Ninth Cause of Action) against Kyra Speller (a now dismissed Defendant), as well as a conspiracy claim arising out of DSS's investigation asserted against both Williams and Speller (Marianne's Tenth Cause of Action). However, since Marianne has dismissed all of her claims against Speller, both Marianne's individual cause of action against Speller as well as her conspiracy claim, since that cause of action asserts that Speller was who Williams conspired with, has been dismissed as well. See Court Docket Nos. 40 and 41 in case No. 9:16-288. See also Chase v. LOP Capital, LLC, No. 13-162, 2014 WL 12605565 at * 6 (D.S.C. Apr. 2, 2014) (citing Vaught v. Waites, 387 S.E.2d 91, 95 (S.C.Ct.App. 1989) [More than one actor required to prove conspiracy], adopted by, 2014 WL 4955267 (D.S.C. Oct. 2, 2014).



with respect to this claim is not sufficient to create a genuine issue of fact as to whether Williams violated the constitutional rights of the Plaintiffs, and she is therefore entitled to summary judgment on this claim.

It is undisputed in the evidence that, whether Bilyard was instructed by Jones to contact DSS or not, DSS was contacted by law enforcement to open an investigation because Joel had been accused of having had unlawful sexual contact with a minor. Indeed, by the time DSS became involved, Joel had already been arrested on the charge of criminal sexual conduct with a minor, an arrest in which Williams or DSS played no role whatsoever. DSS was simply the recipient of information from law enforcement that an individual they had charged with criminal sexual conduct with a minor had minor children in his home. <u>Speller Deposition</u>, p. 8.[33] Thereafter, on Monday, July 13, 2015, Williams and fellow DSS employee Theresa Greene went to Joel's residence to interview his minor children. Williams and Greene wanted to interview the children in an effort to confirm they had not been subjected to any abuse and felt safe in the house. <u>Marianne Iacopelli Deposition</u>, p. 32. Marianne testified that each child's interview took two to three minutes, totaling about fifteen minutes. <u>Id</u>., p. 34. Marianne also told Williams and Greene that her children did not know that Joel was in jail and asked them to keep that fact from her children, which they did. <u>Id</u>., pp. 31-32.

Following the children being interviewed, Williams showed Marianne a "safety plan" and said that she needed to sign it. Williams told Marianne that she [Marianne] was being made the "protector of the children", and that if Joel was released on bond from the Detention Center he was

---

[33]Where an evidence cite is not followed by a docket number cite, it is evidence that has been submitted with a motion to seal. Since the Court has not ruled on that motion at this time (and the documents subject to the motion to seal have not been placed on the court docket at this time), no docket number cites are currently available.



not to have unsupervised visitation with the children.  Id., pp. 35-36.[34]  The DSS safety plan form[35] (a copy of which has been submitted as evidence) provides that "If the parents refuse to sign a valid safety plan, an out of home placement must be sought by Law Enforcement or Ex Parte Order to keep the child safe, pending completion of the investigation".  Williams Deposition, attached Exhibit 1.  Marianne initially balked at signing the safety plan, but did so after she was told that she had to sign the paper or else DSS would take the children into custody.  Marianne Iacopelli Deposition, (Court Docket No. 112-4), p. 36.  Marianne conceded that Williams was polite throughout this interview.  Id., , pp. 69-70.

The day after Williams visited the Iacopelli home, she began working to schedule forensic interviews of the Iacopelli's four children as part of the Child Protective Service Assessment.  See Williams Exhibit E.  This included contacting the Port Royal Police Department, the Beaufort County Sheriff's Office, the Solicitor's Office, and Hope Haven.  Id., see also Williams Deposition, p. 12.  Williams was advised by Hope Haven that the minor involved in the alleged incident had already been interviewed, and Williams also sent out a request for a criminal background check on Joel.  Williams obtained the results of the background check the following day (July 15, 2015), which showed that Joel had no criminal record.  Williams also obtained a copy of the alleged child victim's interview report on July 16, 2015.  See Williams Exhibit G.

On July 22, 2015, Williams met with Speller (her supervisor).  They discussed the information they had at that time, including their positive findings that the children had suitable housing, that none of the children had reported that Joel had touched them inappropriately, that

---

[34]Page 36 of this deposition is located at Court Docket No. 112-4, p. 1.

[35]See SCDSS Policy Manual (Court Docket No. 112-7), pp. 83-87.



Marianne appeared to have good caretaker capacity skills, and that Marianne had signed a safety plan. Conversely, under the heading of what DSS remained worried about, it was noted that the sexual abuse allegations against Joel were still pending (with Joel at that time still in jail awaiting a bond hearing), and that a man who will sexually abuse a minor could also sexually abuse his own minor children. In conclusion, since none of the children reported that they had been touched inappropriately and appeared to be well taken care of with Marianne having a good caretaker capacity, but in light of the pending charges against Joel, the case was assigned a 6 on a scale of 0-10 for how safe the children were, with 0 being "the children are so unsafe we must seek . . . removal immediately", and 10 being "the children are so safe we can prepare to close the case". The DSS form indicates that steps to be taken included obtaining medical records, criminal background checks (which Williams had received for Joel), and for Joel to be interviewed. <u>See</u> <u>Williams Exhibit I</u>. The Iacopelli children were also to be scheduled for forensic interviews, which is the protocol in sexual abuse cases. <u>Speller Deposition</u>, pp. 22-24.

The following day, Joel bonded out of jail following his hearing before Circuit Judge Thomas Cooper. DSS was not advised that this hearing was taking place, nor were they present at the hearing. <u>Williams Deposition</u>, pp. 12-14.[36] Even so, Joel was not allowed to reside at the home pursuant to the DSS safety plan while the investigation continued. On July 24, 2015, someone from Plaintiff's attorney's office emailed Williams requesting a copy of the safety plan. <u>Joel Iacopelli Deposition</u>, attached Exhibit 6. A copy of the safety plan was thereafter provided to Plaintiff's counsel on July 28, 2015. <u>Id</u>. Williams further advised Plaintiff's counsel that the forensic interviews

---

[36]Williams testified that she contacted Bilyard and asked him why they were not informed that the Judge at the bond hearing stated that he could be around his children, but no other children. <u>Williams Deposition</u>, pp. 13-14.



of the Iacopelli children had been scheduled at Hope Haven for August 6, 2015.  Id.; see also Joel

Iacopelli Deposition, p. 73.  See also Williams Exhibit K. (Hope Haven Intake Form).  However,

Marianne took the Iacopelli children to Disney World on August 1, 2015, and did not return until after

August 6, 2015, the scheduled date for the forensic interviews.[37]  At her deposition, Marianne denied

that she knew her children had been scheduled for their forensic interviews on August 6, 2015.

Marianne Iacopelli Deposition, pp. 49-50.  However, Joel testified that both he and Marianne were

aware of the scheduled interviews, but that their attorney (Mr. Newman) had told them they did not

have to go.  Joel Iacopelli Deposition, pp. 59-60, 74-75.[38]  Williams testified that she also never

interviewed Joel because Plaintiff's attorney, Jared Newman, told her not to contact Joel directly.

Williams Deposition, pp. 33-34.

On August 11, 2015 Williams met with Charles Brown (Program Coordinator) about

the status of the Child Protective Service Assessment for the Iacopellis, and it was decided that the

assessment for any danger to the Iacopelli children would be deemed "unfounded".  See generally,

Williams Deposition, pp. 41-44, and attached Plaintiff's Exhibit 4.  Thereafter, on August 17, 2015,

a letter was sent to the Iacopellis notifying them that the "investigation/assessment did not produce

a preponderance of the evidence" that their children were abused or were being abused or neglected.

---

[37]Joel did not accompany the family to Disney World.  In addition to being prohibited from being alone with his children pursuant to this DSS safety plan, Joel's bond prohibited him from leaving the States of South Carolina or Georgia.  Joel Iacopelli Deposition, pp. 48-49.

[38]However, Williams points out in her brief that other than the emails of July 24 and 28, 2015 between DSS and Newman's office, there is no other written correspondence between DSS and Newman, or any evidence that DSS ever told Newman that the Iacopelli children did not need to attend the forensic interviews as scheduled.  Moreover, the Hope Haven intake form shows that the Iacopelli's counsel called Hope Haven on August 3, 2015 (while Marianne was in Florida with the children) trying to have the interviews cancelled.  See Williams Exhibit K.



Id., and attached Plaintiff's Exhibit 5.[39]  In the interim, Joel had had his preliminary hearing before

Judge Brooks on August 14, 2015, and had moved back in with his family on August 15, 2015.[40]  See

Joel Iacopelli Deposition, pp. 43, 50, 57.  Judge Brooks thereafter entered an order dismissing the

criminal charges against Joel on August 20, 2015.

        This evidence does not present a genuine issue of fact as to whether Williams violated

Plaintiffs' constitutional rights by unreasonably invading their federally protected interest in the

sanctity of their home and private family relationships.  To the contrary, the government "has a

legitimate interest in protecting children from neglect and abuse and investigating situations that may

give rise to such neglect and abuse".  Martin v. St. Mary's DSS, 346 F.3d 502, 506 (4th Cir. 2003).

Here, the Beaufort DSS office had been notified by law enforcement that Joel had been charged with

sexually abusing a minor, and that Joel had four minor children at home.  DSS would have been

derelict in its duty not to have initiated an assessment to determine whether Joel's minor children were

safe in the home under these facts.  Indeed, Plaintiffs concede in their brief that they had no right to

be free from a DSS investigation under the facts presented.[41]  See Plaintiffs' Brief, p. 34.  Even so,

Plaintiffs argue that their substantive due process and liberty rights were nonetheless violated due to

"the unconstitutional removal of [Joel] from his home without due process of law and the

government's interference with [the] parent-child relationship and family structure".  Id., p. 29.  See

---

[39]However, the zip code on the letter was incorrectly shown as being 29907, when the correct zip code was 29906, and Plaintiffs state that they never received this letter.  See Marianne Iacopelli Deposition, pp. 58-59; Williams Deposition, pp. 46-47; Joel Iacopelli Deposition, pp. 75, 79.

[40]Joel testified that after several attempts by his lawyer to contact the "DSS people," they finally got the answer that he could potentially go home.  See Joel Iacopelli Deposition, pp. 43, 62.

[41]Even Michael Corey, Plaintiffs' Expert, testified that he was not criticizing DSS for accepting the case.  See Corey Deposition, pp. 56, 69.



Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion) [Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests"].

Williams argues in support of her motion for summary judgment, and the Plaintiffs have not disputed, that no South Carolina, Fourth Circuit, or United States Supreme Court case has ever found that a decision to leave children in the custodial care of one parent while requiring the other parent not to have unsupervised contact with the children is an unconstitutional intrusion into a parent's family life. See Jean v. Collins, 155 F.3d 701, 709 (4th Cir. 1998) [Holding that the courts are not to look beyond the applicable case law in determining whether a specific right was really established] vacated on other grounds, 526 U.S. 1142 (1999); see also Doe ex. rel Johnson v. SCDSS, 597 F.3d 163, 177 (4th Cir. 2010) [Finding that where there was no authority from applicable case law that would have put the DSS worker on fair notice that her actions violated the claimant's Fourteenth Amendment substantive due process rights, the DSS worker was entitled to qualified immunity]. While a family unit is indeed a "fundamental precept firmly ensconced in the constitution and shielded by due process"; see Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994); the decisions made by Williams in this case did not unconstitutionally infringe on that right. DSS began its investigation after Joel was jailed charged with sexually molesting a minor child. After meeting with the children and Marianne at the home and finding as part of her initial assessment that there were no problems with either the residence or Marianne, Williams did not remove or seek removal of the children from the home, but allowed the children to remain there with Marianne (not even telling them about what had happened to their father or his arrest), while as a precaution also directing that Joel should have no "unsupervised" contact with the children pending the results of DSS's assessment of the situation. The right of familial privacy does not include a constitutional right to be free from child abuse



investigations; <u>Hodge</u>, 31 F.3d at 164 (citing <u>Watterson v. Page</u>, 987 F.2d 1, 8 (1st Cir. 1993)); and while there are few rights more fundamental in and to our society than those of parents to rear their children as they deem appropriate, these rights are not absolute, with a parent's right to custody being subject to the child's interest in his personal health and safety and the State's interest as <u>parens patriae</u> in protecting that interest.  <u>See</u>  <u>White by White v. Chambliss</u>, 112 F.3d 731, 735 (4th Cir. 1997) [Internal citations and quotations omitted].

        Here, of course, the children were not even removed from the parents' custody by the State.  Marianne was allowed to retain custody of the children, with Joel being limited to no unsupervised visits pending results of the DSS Assessment and investigation into his conduct, for which he had been criminally charged.  These facts do not show that Williams violated any "clearly established" law by having Marianne execute the safety plan in this case or otherwise violated the substantive due process rights of the Plaintiffs; therefore, her conduct can result in no liability.  <u>Cf.</u> <u>Chambliss</u>, 112 F.3d at 735-736; <u>Doe ex. rel. Johnson</u>, 597 F.3d at 177.  With regard to the safety plan, Plaintiffs' expert Michael Corey agreed that DSS did the least intrusive safety plan available. <u>Corey Deposition</u>, pp. 65-67.  The evidence further clearly shows that, thereafter, Williams continued with her investigation and assessment, including obtaining a criminal background check on Joel, scheduling the Iacopelli children for forensic interviews, and meeting regularly with DSS staff to assess the status of the investigation.[42]  As has already been noted, the entire investigation was

---

[42]Plaintiffs argue, in part, that Williams violated their constitutional rights by failing to fully comply with the requirements of the applicable state law [the South Carolina Child Protection and Permanency Act, S.C.Code Ann. § 63-7-10, <u>et</u> <u>seq</u>.) in conducting her assessment, including by failing to conduct a face-to-face meeting with the Plaintiffs prior to sending out the notice letter, by failing to properly complete a full risk assessment, by requiring a safety plan be implemented even though there was no "present or impending danger" to a child, and by failing to act in a manner compatible with due process of law.  <u>See</u> S.C.Code Ann. § 63-7-10(B)(4); <u>see</u> <u>also</u> <u>Corey Report</u>, (continued...)



wrapped up within a reasonable amount of time with a determination in the Plaintiffs' favor.[43]  The

fact that the letter mailed to the Plaintiffs notifying them of this fact had an incorrect zip code on it

was mere negligence, and does not give rise to a constitutional claim.  See Daniels v. Williams, 474

U.S. 327, 335-36 n. 3 (1986) [Negligence claim is not actionable under § 1983]; Harrison v. Sumter

County Sheriff's Dep't, No. 17-3442, 2018 WL 1225108 at * 1 (D.S.C. Mar. 7, 2018) [Negligence

claim not actionable under §1983].

Therefore, this claim is without merit.  Williams is entitled to summary judgment on

Plaintiffs' federal constitutional claim.

### State Law Causes of Action

Both Plaintiffs assert several state law causes of action.  Initially, it is noted that as a

result of the recommendation set forth herein that Marianne's federal causes of action are subject to

---

[42](...continued)
p. 15, # 7 (Court Docket No. 112-3), p. 15 (Quoting SCDSS Policy Manuel p. 78 (Court Docket No. 112-7) p. 78; Corey Deposition, p. 101-103, 141-142, 152.  However, negligence, or even carelessness, by Williams in the performance of her duties (even assuming such was to be found) does not amount to a constitutional violation, nor can Williams be held liable for her discretionary finding of a possible danger in letting Joel have unsupervised access to his minor children given the charges he had pending against him.  Doe ex rel. Johnson, 597 F.3d at 175 [Finding that negligence, and even carelessness, that does not rise to the level of deliberate indifference fails to present a constitutional claim]; Hodge, 31 F.3d at 167 [Officials are not liable for bad guesses in gray areas]; cf. Johnson v. S.C. Dep't of Corrections, No. 06-2062, 2007 WL 904826 at *12 (D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that Defendants did not follow their own policies fails, as the failure of [Government] officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990) [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]).

[43]The parties do not dispute that DSS regulations provide that DSS has forty-five (45) days from receiving an initial intake to render a finding on its initial investigation.  See Corey Deposition, p. 158.  The evidence presented shows that DSS opened the investigation in this case on July 13, 2015, and that the letter to the Iacopellis notifying them that a finding of "unfounded" had been entered was sent August 17, 2015, which is thirty-six (36) days after the initial intake.



50

dismissal, the only claims remaining in her lawsuit are state law causes of action. In <u>Carnegie-Mellon v. Cohill</u>, 484 U.S. 343 (1988), the Supreme Court held that "in the usual case in which all federal - law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state law claims". <u>Carnegie-Mellon</u>, 484 U.S. at 350, n. 7. As such, the undersigned would normally recommend that Marianne's remaining claims be remanded back to state court for disposition. <u>See also</u> <u>Clark v. Brown</u>, 861 F.2d 66, 68 (4th Cir. 1988)[Directing dismissal of state law claims on remand following dismissal of Plaintiff's federal § 1983 claim]; <u>Mills v. Leath</u>, 709 F.Supp. 671, 675-676 (D.S.C. 1988) [Noting that federal courts should generally decline to exercise pendant jurisdiction over remaining state law claims after dismissal of federal claims in a lawsuit].

However, as Marianne's state law claims are based on the same facts as Joel's state law claims, and as Joel's case does still include a federal cause of action under § 1983 for false arrest, remand of Marianne's case could result in inconsistent verdicts on these claims if Joel's claims remain in federal court. However, as Joel's Complaint now only contains one viable federal claim (as previously determined and set forth herein, <u>supra</u>), but has seven state law claims asserted, rather than retaining supplemental jurisdiction over Joel's state law claims, the Court should consider whether it would be appropriate to retain jurisdiction only over Joel's federal claim for false arrest, while remanding both Marianne's case as well as all of Joel's state law claims back to state court for disposition. The "factors" referred to in <u>Carnegie-Mellon</u> that a court should consider in deciding whether to retain or remand state law claims are judicial economy, convenience, fairness, and comity. Here, comity obviously favors a remand, as a remand of these remaining state law causes of action will allow the more appropriate court to rule on these exclusively state law issues. <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966) ["Certainly, if the federal claims are dismissed before



trial, . . . the state claims should be dismissed as well"].  These are also no issues of judicial economy, convenience or fairness weighing against remand, as discovery has been completed and the summary judgment motions have been briefed and are ready for decision.  Additionally, the state court is not only the more appropriate court to rule on these exclusively state law claims, it is the more appropriate court to then try these claims if summary judgment were to be denied.  Therefore, the <u>Carnegie-Mellon</u> factors support remand of these cases.[44]

Moreover, this Court has the authority to separate out Joel's federal claim and remand his remaining state law claims pursuant to 28 U.S.C. § 1367(c)(2).  <u>See</u> <u>Dashields v. Robertson</u>, No. 99-1124, 2000 WL 564024, at * 3 (4th Cir. 2000) [Noting that District Courts enjoy wide latitude in determining whether or not to retain jurisdiction over state law claims, even in cases in which state law merely predominates]; <u>cf.</u> <u>Diven v. Amalgamaeed Transit Union Int'l</u>, 38 F.3d 598, 602 (D.C. Cir. 1994) [Explaining that state law predominates when "the state law claims are more complex or require more judicial resources to adjudicate or are more salient in the case as a whole than the federal law claims"] (internal citation and quotation marks omitted).  Reviewed under the applicable standard, in Joel's case, of the eight remaining causes of action, only one of them (Joel's false arrest claim) is a federal claim.  That claim is also only asserted against two of the five remaining Defendants, while none of Joel's state law causes of action are asserted against either of those two Defendants.  The standard for evaluating the facts and evidence relating to Joel's sole federal claim is also wholly different than the standard for evaluating the facts and evidence with respect to Joel's state law claims.  Additionally, the facts and evidence with respect to many of Joel's state law claims are not even the

---



[44]Whether the Complaint was originally filed in federal court is another factor to consider.  <u>Spears v. Water & Sewage Auth. of Cabarrus Cty.</u>, No. 15-859, 2017 WL 2275011, at * 9 (M.D.N.C. May 24, 2017).  Here, the case was not originally filed in federal court - it was removed to this court by the Defendants from the Plaintiffs' preferred state court jurisdiction.

same facts and evidence that would be considered when evaluating Joel's sole federal claim. Retention of Joel's entire case would therefore be asking this Court "to use supplemental jurisdiction to hear what amounts to the heart of [his] case, based on the presence of a federal cause of action that is essentially tacked on to the state law claims". <u>Gill v. PNC Bank, Nat. Ass'n</u>, No. 14-677, 2015 WL 629004, at * 6 (D.Md. Feb. 11, 2015). Under similar circumstances, federal courts have declined to exercise supplemental jurisdiction over state law claims, even while retaining a federal cause of action for disposition. <u>Id</u>., at * 5-6; <u>see also</u> <u>Dashields</u>, 2000 WL 564024 at * 3; <u>Edson v. Menard</u>, No. 17-31, 2018 WL 734404 at * 2 (D.Vt. Feb. 6, 2018) [Although court retained jurisdiction over plaintiff's federal claims, it remanded his state law claims which substantially dominated over the federal claims]; <u>cf</u>. <u>VonRosenburg v. Lawrence</u>, No. 13-587, 2018  WL 1790827, at * 5 (D.S.C. Apr. 16, 2018).[45]

Therefore, if the Court adopts the recommendation herein for dismissal of Plaintiffs' federal claims, since only Joel's case will then still have a federal claim remaining (with Marianne's case having no remaining federal claims), and as Joel's state law claims predominate over the sole remaining federal claim over which this District Court has original jurisdiction, Joel's state law causes of action (as well as Marianne's entire case) should be remanded back to state court for disposition. <u>Dashields</u>, 2000 WL 564024, at * 3 [finding that the district court's remanding of the remaining state law claims was proper and well within the wide latitude of discretion afforded trial courts under 28 U.S.C. § 1367(c) and § 1441(c)]; <u>Gill</u>, 2015 WL 629004, at * 5–6; <u>see also</u> <u>Carnegie-Mellon</u>, 484 U.S.

---

[45]As such, this is not a case where the sole federal claim and the state law claims all arise out of the same common nucleus of facts and involve overlapping evidence, such that in the interest of judicial economy, convenience, and fairness to the litigants, the Court should continue to exercise supplemental jurisdiction over the state law claims. <u>Cf</u>. <u>Addeo v. Philadelphia Firefighter and Paramedic Union</u>, No. 17-2239, 2018 WL 1378939, at * 6 (E.D.Pa. Mar. 19, 2018).



at 350, n. 7 [Federal court may decline to exercise jurisdiction over state law claims after evaluation of the balance of factors to be considered].

Finally, based on the case posture and facts presented in these two lawsuits, the undersigned finds that the question of remand of Marianne's case in toto, and remand of Joel's related state law claims (with this Court retaining jurisdiction over his sole federal law claim), should be determined in the first instance, as if remand of these state law claims is to be ordered, the state court (as previously noted), not this federal court, is the court that should rule on whether or not summary judgment should or should not be granted on these state law claims. Therefore, the undersigned has not addressed whether summary judgment should or should not be granted on these claims pending a final finding and ruling by the District Judge on the issue of whether Joel's federal claim should be separated out from the remainder of his case, with his state law claims being remanded to state court. In the interim, the Defendants' motions for summary judgment with respect to all of the state law claims presented (in both Joel and Marianne's cases) are **moot**.

In the event the District Judge adopts the recommendations set forth herein for remand of these claims, the Defendants will be able to present their grounds and arguments for summary judgment on these claims to the state court. However, if the District Judge determines that this Court should retain jurisdiction over Joel's state law claims, then in that event it is the recommendation of the undersigned that Marianne's case also not be remanded to state court (even though it contains no federal claims), as both sets of claims should at that point be retained in this Court in the interest of judicial economy, convenience, and fairness to both litigants. In that event, both cases should be re-referred back to the undersigned, at which time the undersigned will enter an Order restoring the Defendants' motions for summary judgment with respect to these state law claims to the docket, and a Supplemental Report and Recommendation



will then be entered addressing the merits of those remaining claims, and whether or not summary judgment should be granted thereon.

### Conclusion

Based on the foregoing, it is recommended that the Defendants Bilyard and Griffith's motions for summary judgment with respect to Joel's federal claim for false arrest under 42 U.S.C. § 1983 be **denied.** The Defendants' motions for summary judgment with respect to both Joel and Marianne's federal claims relating to the search warrants, the federal claims against Williams relating to the DSS investigation, and Joel's separate federal claim against the Town of Port Royal, should be **granted** for the reasons stated.

It is further recommended that if the Court adopts the recommendations set forth herein with respect to Plaintiffs' federal claims, that Marianne's case be **remanded** back to state court, in toto, for disposition of her remaining state law claims, and that Joel's remaining state law causes of action also be **remanded** back to state court for disposition, with this Court to retain sole jurisdiction over Joel's federal claim for false arrest. Gill, 2015 WL 629004, at * 5-6. If, however, the Court determines that it should retain jurisdiction over Joel's state law causes of action, then in that event it is further recommended that this Court also retain jurisdiction over Marianne's case, even though it only has state law claims remaining. These cases should then be re-referred to the undersigned, the Defendants' motions for summary judgment with respect to these state law claims will be restored to the docket, and a Supplemental Report and Recommendation addressing Plaintiffs' remaining state law claims will then be entered.



The parties are referred to the Notice Page attached hereto.[46]

_____
Bristow Marchant
United States Magistrate Judge

May 2, 2018
Charleston, South Carolina

---

[46]See also footnote 23, supra.



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).